FRED A. GAMBOLD, as Executor of CHARLES S. LAMPHEAR, Deceased, Respondent, *v.* GEORGE W. MACLEAN et al., as Executors and Trustees under the Will of KATHERINE L. MACLEAN, Deceased, Appellants.

(Argued November 20, 1930; decided January 6, 1931.)

*Herman A. Gray, William R. Willcox* and *Jay Noble Emley* for appellants. Plaintiff proved no express trust and no trust can be inferred. (*Lopez* v. *Campbell*, 163 N. Y. 340; *Wadd* v. *Hazelton*, 137 N. Y. 215.) Plaintiff is estopped by the conduct of his testator from claiming a trust. (*Board of Education* v. *Day*, 128 Ga. 156; *Sargent* v. *Salmond*, 27 Me. 539; *Fay* v. *Lambourne*, 124 App. Div. 245.) Plaintiff's claim was released. (1 Williston on Contracts, § 322; 1 Parsons on Contracts [9th ed.], 11; *U. S. Printing & Lithograph Co.* v. *Powers*, 233 N. Y. 143; *Whittemore* v. *J. L. & S. O. Co.*, 124 N. Y. 565.)

*John A. V. Murphy* and *Herbert P. Queal* for respondent. There is ample evidence to warrant the finding that there was a trust. (*Wood* v. *Rabe*, 96 N. Y. 414; *Bitter* v. *Jones*, 28 Hun, 492; *Goldsmith* v. *Goldsmith*, 145 N. Y. 313; *Lamb* v. *Lamb*, 18 App. Div. 250; *Jeremiah* v. *Pitcher*, 26 App. Div. 402; *Harrington* v. *Schiller*, 231 N. Y. 278; *Sinclair* v. *Purdy*, 235 N. Y. 245; *Percy* v. *Huyck*, 252 N. Y. 168; *Matter of Brown*, 252 N. Y. 366.) The plaintiff is not estopped to bring this action. (*Stanton* v. *Hawley*, 193 App. Div. 559.) Plaintiff's claim was never released or satisfied. (*Whittemore* v. *Judd Linseed Co.*, 124 N. Y. 565.)

CRANE, J. In February of 1866, John Healy died in Kings county, N. Y., leaving a last will and testament, in which he left two pieces of property in Brooklyn to his daughter, Mary Ann Lamphear, for life, and the remainder

to his grandchildren, Charles S. Lamphear, Amos S. Lamphear, Ella L. F. Nicholson and Katherine L. MacLean. The property consisted of 25 and 27 Nevins street, and 514 Fulton street.

Mary Ann Lamphear, the life tenant, died on December 7, 1912, at which time the grandchildren were entitled to the property. On September 17, 1912, Charles S. Lamphear transferred by deed his entire remaining interest in his share to his brother Amos and his sister Katherine. At that time his mother, living at 35 Cambridge place in Brooklyn, was old, blind, sick and was expected to die within a short time. In fact, she did die, as above stated, a little over two months thereafter on the seventh day of the following December.

Charles S. Lamphear was a miner and prospector residing at Patagonia, Santa Cruz, Ariz. He talked in millions and was always hard up; in need of money. His correspondence indicates that he was a hard man, lacking in those customary feelings which most people have for the immediate family, and especially the mother — the mother could not die soon enough for him, and he complains of her living as long as she did. So badly did he need money that, prior to his transfer, above mentioned, he had mortgaged his interest for $25,000 to the Real Estate Title and Trust Co. in Philadelphia. This money was gone, and he needed more. He came to his brother Amos and in his own words asked: " Will you and Kate rustle me up a couple of thousand dollars? " Amos and Katherine, through a note discounted at the Peoples Trust Company advanced the $2,000 to Charles, the transaction being closed by Mr. Ellett Hodgskin, in the office of Wingate & Cullen, of which firm he was a member. The deed on its face was absolute. Mr. Hodgskin testifies that he called Charles' attention to the state of his mother's health and asked him to consider the wisdom of his acts. Charles wanted the money at once; he could not wait. He needed it, so he said, for his specula-

tions, which would result in millions. He would have riches when the others were still waiting for their money. According to the competent evidence, the sale by Charles to his brother and sister was absolute and unconditional. There was no promise to hold his interest or any part of it in trust, nor did Charles rely or act upon any such promise or understanding.

Katherine L. MacLean, the sister, died the following year, in June of 1913, and in 1914 Charles made a claim that the transfer to his brother Amos and to his sister was merely as security for the $2,000 advanced. He thereupon brought a partition suit, in which he alleged that his interest had not been transferred, but was merely subject to this mortgage lien. The action appears to have been tried, resulting in a disagreement. Thereafter, as to Amos and Katherine's estate, the action was severed. In March, 1921, Amos settled with his brother Charles for $8,000, and after Charles' death the action against Katherine's estate was discontinued.

Charles made no other claim, and died on the first day of February, 1922.

Charles' executor, the above plaintiff — neither heir nor next of kin — has brought this action upon an entirely different theory than that maintained by Charles in his lifetime. He alleges that the transfer made by Charles to Amos and Katherine was in the nature of a trust; that they later declared a trust in the property, and he has brought this action to enforce it.

The complaint alleges that Charles executed and delivered to Amos and Katherine a deed of all his right, title and interest to his one-quarter undivided part of the estate of his grandfather John Healy in trust upon an agreement for his benefit, made by Amos and Katherine, share and share alike, to pay him $2,000 in cash and, in addition thereto, to take care of him during his lifetime by creating a trust for his benefit to pay or secure to him the equivalent of at least four per cent per annum on the

value of said one-quarter share or interest or the invested equivalent thereof.

To sustain the judgment which has been given in favor of the plaintiff, it must appear that such a trust was declared in writing. In the absence of any agreement or inducement amounting to a promise, express or implied, intention is insufficient unless carried out. (*Percy* v. *Huyck*, 252 N. Y. 168.) This is not a case of unjust enrichment under cover of the relation of confidence. (*Sinclair* v. *Purdy*, 235 N. Y. 245.) The action is in form to enforce a specific agreement resulting in a sale and is based upon written instruments alleged to create or declare a trust.

In a letter dated September 16, 1912, the day before Charles transferred his property, Amos wrote to Katherine a letter in which he said that Charles had been in town for two months looking for some money to put in his mine. " I simply did what I could among different mining people here in town to try and interest them, but it was utterly impossible." He then writes that Charles had said: " If we would give him $2,000 in cash he would sell the interest to us in the balance of the estate belonging to him, and if at mother's death we wanted to do anything for him, that would be up to us." And continuing, he said: " I believe I can borrow $2,000 from the Peoples Trust Co. to pay Charlie off. Take over his interest in our name and then Mr. Hodgskin says after this is done, we can write a letter to Charlie stating that we have purchased his interest without any comeback as value in full, but feel that after mother's death occurring that we do not wish to take it entirely away from him. That after her death whatever is to be paid off and which he is liable for, shall be done, and the balance placed out for him through the Trust Co. on a 4% basis, during the term of his life, and payable to him quarterly or semi-annually by them."

The next day, the 17th of September, these parties

appeared in the office of Mr. Hodgskin, and Charles executed a deed of transfer, absolute on its face. No trust agreement was signed and no such letter as above suggested was ever written to Charles. There was introduced in evidence in this case a blank trust agreement, dated in October, 1912, a month after the sale, running to the Peoples Trust Company, never signed nor executed. It is simply a blank form of a trust which is somewhat different in its terms from that suggested in Amos' letter, as quoted above.

Katherine wrote certain letters, and it is said that these amount to a declaration of trust. In a letter not dated, written to her sister, Mrs. Nicholson, Katherine says: " Have just returned from a seance with my attorney. The matter of signing note is all right, but other papers NO. * * * I really feel so sorry for Charlie — poor boy — he is our brother — has been up against life's problem — but to think he is selling out for $2,000. He declares he will come out on top, and I hope so, he is so bright and clever."

On the 18th of September, 1912, or the day after the transfer from Charles, Katherine telegraphed her sister Mrs. Nicholson, who was in Rome, N. Y. "After consulting attorney have arranged and signed note and taking over Charles's interest." Amos telegraphed about the same time to Mrs. Nicholson: "Arrangements made with Trust Co. to buy Charles's interest * * * under no promises to pay anything after Mother's death leaves it to us." In a letter dated Thursday, the 18th, Mrs. Mac-Lean writes to Mrs. Nicholson, " Charlie had threatened to sell out his remaining interest — to, as Amos says, Professional Crooks —* * * Now as Amos's lawyer Mr. Hodgskin explained — that we three buy out for the $2,000 sign note, etc." Again, Katherine writes to Mrs. Nicholson the one letter about which this case has hinged. It reads: "Have just returned from down town. Went over to Amos office first — as he said the agreement would

be ready — altho I will not sign it until Mr. G. returns, as he will hand it to my lawyer. Now Ella that note part is all right. It gives us an equity in what will be left of C's part of the estate after his death. That is he will have it placed at 4% interest, then divided between us or our heirs. * * * "

This letter is clearly explained by an affidavit made by Amos, November 1, 1912, in a suit brought by Ella Nicholson, his sister, against him and his mother. This was before the life estate had fallen in. He there stated: "Although my sister and I have purchased the interest of my brother Charles in said premises, it is our intention to create a trust fund from the amount of his share, the income of which up to four per cent per annum, shall be applicable to him during his lifetime." The last letter to be referred to is dated Sunday, November 10, 1912, and was written by Katherine to her brother Charles, and refers no doubt to this transfer of his interest and the intention of the parties. She writes: " Now about the papers relative to you — and the sale — I have not signed — Mr. G. took the paper Amos sent me — he found that it was not the same form of agreement that he had seen in Amos's office — so forbade my signing until it was rectified or righted. Then too it was sent thro the mail — and I have not seen your part of the agreement or any papers but the one sent me bearing on the case." Evidently Charles was to make some agreement upon his part; was it to remain away from New York and stop bothering his relatives; was it something to do about his mother, or his habits — who can tell? The years are silent.

What is the significance of these communications and what story can we weave out of the past, now that Charles and Katherine are dead? Charles apparently was a spendthrift, a speculator in mining properties, with ideas of quick wealth on small investments. After

borrowing on his remainder interest, he sought a second loan. He needed money badly and needed it quickly. His brother Amos and his sister Katherine took over his contingent interest, such as it was, and paid him $2,000 for it. According to the oral testimony of Mr. Hodgskin and Miss Woolfson, the transfer was complete and absolute without condition. The brother and sister, however, while not bound to do anything more for Charles, did intend to create a trust for him out of such part of his remainder as might be left. What the conditions and circumstances were under which such a trust would be created, we do not know. Such an agreement some months afterwards was prepared, but never executed. Katherine writes to her sister that such is the intention, but she also states that the papers which had been prepared are not satisfactory to her lawyer, and she also, as well as her brother, states at the time that the sale is unconditional, without any obligation upon their part to create a trust, and that if it be done, it will be entirely voluntary upon their part.

This conclusion is further fortified by the fact that Charles never understood or claimed that there had been a trust created for him or that there was to be one created. He claimed and testified in the partition suit that his deed was a mortgage; that he was to have his remainder interest back when he had paid the amount of the loan. Not until his death, ten years after his deed, was there claim made that it was given in trust, and this claim is advanced by the executor, who knows nothing about it, except as he spells it out of the letters. There can be no doubt that it was the intention of Amos and Katherine to do something for Charles after his mother's death, provided there was anything left of his remainder, but the evidence falls far short of proving any binding agreement made at the time of the transfer to create a trust, or of proving the declaration of a trust. There was the intention to create a trust for Charles, but there is no

proof that his transfer of his property was made in consideration of or in expectation of any such trust. The intention was to do something voluntarily for Charles, but the intention was never carried out, the trust was never created. What happened between these estranged brothers and sisters to cause Amos and Katherine to change their minds we do not know. Litigation between them started soon after the mother passed away. Charles for ten years never thought of a trust nor stated that his deed was given upon any such promise or consideration. The letters referring to what was to be done do not in this instance and under these circumstances constitute the accomplished fact — the setting up of the trust alleged.

In reviewing the facts, reference has been made to an affidavit made by Amos in another action, to letters and telegrams written by him, to the testimony of Charles regarding transactions with his sister, given against her estate in the partition action brought after her death, and also to transactions with Mr. Hodgskin, the lawyer, in the absence of Katherine, in negotiating for the sale of his (Charles) interest. Some of this evidence was incompetent, but we need not pass upon the objections and exceptions taken to it, as we hold even under the very liberal rulings made by the able trial judge, that the plaintiff has failed to make out a case. In equity upon an examination of remote events for the discovery of any unfairness, overreaching or betrayal of trust much liberality is often permitted in the introduction of evidence. However, with all the evidence in the case — relevant and irrelevant — we cannot find that declaration of trust made by Katherine and Amos sufficient to sustain the judgment.

The interlocutory and the final judgments appealed from should be reversed, and the complaint dismissed, with costs in all courts.

CARDOZO, Ch. J., POUND, LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Judgments reversed, etc.