In re Dr. J. Herbert FILL, Debtor.

Leon GRAY, Trustee in Bankruptcy of the Estate of Dr. J. Herbert Fill, Plaintiff,

v.

Antje Mullikas FILL and Kate Mullikas, Defendants.

Bankruptcy No. 85 B 11531 (TLB). Adv. No. 86–5127A.

United States Bankruptcy Court, S.D. New York.

Dec. 11, 1987.

Paul, Weiss, Rifkind, Wharton & Garrison by Leslie Gordon Fagen, Jeffrey B. Sklaroff, New York City, for trustee.

Kensington, James & Ressler by Stuart M. Bernstein, New York City, for Antje Mullikas Fill.

Walter, Conston, Alexander & Green, P.C. by Gregory F. Hauser, New York City, for Kate Mullikas.

## DECISION ON TRUSTEE'S COMPLAINT TO SET ASIDE FRAUDULENT TRANSFERS AND FOR OTHER RELIEF

TINA L. BROZMAN, Bankruptcy Judge.

Rarely have we wished for the freedom to craft a script instead of a decision, but this bizarre fraudulent transfer action tempted us sorely. It is laced with backdated promissory notes, false financial statements, missing crucial records, admittedly false and patently incredible affidavits and testimony, outlandish professional conduct, a secret divorce and, not least, the discovery at the close of trial of a memorandum which confirmed much of what the trustee had already circumstantially proven. After reviewing the evidence amassed at the nine-day trial, we have determined that the challenged transfers were indeed fraudulent. Because fraudulent intent by its very nature is rarely susceptible to direct proof and must be established by inference from the circumstances surrounding the allegedly fraudulent act, we must delve into the facts.

### I.

Dr. J. Herbert Fill ("Dr. Fill"), a practicing physician board certified in psychiatry and neurology, filed a chapter 7 petition on September 19, 1985. By order dated November 18, 1985, Leon Gray was appointed trustee ("Trustee") of Dr. Fill's estate. On February 18, 1986, Gray commenced this adversary proceeding against Antje Mullikas Fill ("Mrs. Fill"), Dr. Fill's former wife, and Kate Mullikas ("Mrs. Mullikas"), his former mother-in-law, alleging fraudulent

transfers avoidable by virtue of 11 U.S.C. § 548 and N.Y. Debtor & Creditor L. §§ 273, 273–a, and 276. At issue are two transfers made by Dr. Fill, one to Mrs. Mullikas and/or Mrs. Fill of the proceeds from the sale of a cooperative apartment in New York City ("Apartment 14E") and the other to Mrs. Fill of a condominium located in Bolongo Bay, Virgin Islands ("Condominium"). The Trustee pleads that the transfers are constructively and actually fraudulent in that they were made without fair consideration and with actual intent to hinder, delay and defraud Dr. Fill's creditors and that at the time the proceeds of Apartment 14E were transferred, Dr. Fill was a defendant in a lawsuit brought by Gray International Inc. ("Gray International"). Specifically, the Trustee requests judgment

1. Awarding actual damages in an amount exceeding $650,000;

2. Awarding punitive damages in the amount of $1,300,000;

3. Setting aside the conveyance by Dr. Fill to Mrs. Fill of the Condominium;

4. Declaring that Mrs. Fill holds the Condominium and a new cooperative apartment which she purchased in her name alone ("Apartment 6E") in trust for the Trustee;

5. Preliminarily and permanently enjoining Mrs. Fill from encumbering or transferring title to the Condominium and to Apartment 6E;

6. Directing Mrs. Fill to turn over to the Trustee all of her right, title and interest in and to Apartment 6E; and

7. Awarding the Trustee his costs and expenses, including attorneys' fees pursuant to § 276–a of New York Debtor & Creditor Law.

Mrs. Fill's defense is predicated upon her contention that Dr. Fill held the properties in trust for her. She argues that she always held equitable title to half of the Condominium and Apartment 14E as a result of which Dr. Fill's eventual conveyance to her of the Condominium and her receipt of approximately half the proceeds of Apartment 14E cannot be deemed fraudulent. She maintains that the divorce decree which left title to the properties with Dr. Fill is unenforceable. Finally, she denies any participation in the fraudulent scheme allegedly designed to hinder and delay Gray International or deprive it of a satisfaction of its judgment.

Mrs. Mullikas argues that any conveyance to her by Dr. Fill was made in good faith and without wrongful intent, in satisfaction of an antecedent debt established by a state court judgment not subject to collateral attack. Alternatively, Mrs. Mullikas argues that her maximum liability can only be $115,977.72, the amount she actually retained from the sale of Apartment 14E. Finally, she argues against any award of punitive damages and attorneys' fees to the Trustee. At trial, we reserved argument on the issue of attorneys' fees until after this decision was rendered.

The parties stipulated to this court's jurisdiction to hear and determine this matter as a core proceeding. *See* 28 U.S.C. §§ 1334(b) and 157(a), (b)(2)(A), (E) & (H); 11 U.S.C. §§ 548 and 544(b).

## II.

### A. BACKGROUND

Although the transfers which are attacked by the Trustee are of fairly recent vintage, the story uncovered at trial spans some twenty years, beginning back in 1964 when Dr. Fill was living and working in the Virgin Islands. That year he married Antje Mullikas (Mrs. Fill), a West German, with whom he soon after moved to New York. Two years later the Fills had their only child, a son named Eric Christian Fill ("Christian").

From 1964 through 1972, Dr. Fill was employed in the public sector, earning between $17,500 to $25,000 a year. Mrs. Fill was not employed, yet the Fills lived extraordinarily well. When they first moved to New York, they rented apartments at fashionable addresses and, in 1970, jointly bought Apartment 14E, a two-bedroom cooperative located at 1056 Fifth Avenue. In 1976 they jointly bought the Condominium. They also travelled extensively, both together and alone.

The Mullikases, Mrs. Fill's parents, gave her her half of the $60,000 purchase price of Apartment 14E as well as her half of the $36,000 purchase price of the Condominium. Dr. Fill testified at trial that his share as well came from money given to him by the Mullikases.[1]

The uncontradicted testimony establishes that the Fills lived well above Dr. Fill's income through the largesse of the Mullikases. What was sharply contested, however, was the circumstances surrounding the subsidies, specifically, when money was given, how much was given, to whom it was given and whether it was given as gifts or loans. Both of the Fills testified as to these points. Mrs. Mullikas did not attend the trial and was never deposed.[2] Mr. Mullikas died several years ago.

Our review of the evidence determinative of the factual disputes begins with Dr. Fill's testimony. He was one of the more incredible and untrustworthy witnesses we have encountered. On at least ten occasions his testimony was at a minimum inconsistent with but more often directly contradictory to his testimony during discovery and during his examination pursuant to 11 U.S.C. § 341.[3] His most polished version of the facts, offered at trial, runs as follows:

From the inception of the Fills' marriage and until at least 1980, the Mullikases were providing the Fills with cash. The money was used to pay expenses which Dr. Fill's salary could not cover, such as moving expenses, family expenses incurred during a two year period when Dr. Fill was not gainfully employed and Dr. Fill's extensive travel and medical training expenses. The cash was delivered in varying amounts when the Fills either alone or together were visiting with the Mullikases in West Germany and when Mr. Mullikas visited New York. Sometimes Dr. Fill alone would pass through West Germany, be given money, spend a portion and bring the remainder back to the United States. If Mrs. Fill was travelling alone she often returned with cash. At times the cash given to her was a "loan" to the family; at other times, the cash which she alone received was a gift to her. When the Fills travelled as a family, they would usually divide the cash among themselves (including their son) to bring back to New York. Dr. Fill first testified that he kept all the cash in their apartment and later testified that he deposited some money into the Fills' joint bank account.

Despite the fact that he did not repay his in-laws at any time between 1966 and 1983, Dr. Fill insists that the monies he and his family were receiving from the Mullikases were loans which he alone was responsible to repay. In other words, he was given loans, his wife was given gifts. Dr. Fill testified that the distinction was rooted in the traditional German notion that Dr. Fill, as head of the household, would be ultimately responsible for family and personal expenses. Although Dr. Fill attempted to distinguish money lent to him (but sometimes delivered to Mrs. Fill) from money given to Mrs. Fill, there was no clear set of rules by which the family played.

The supposed payment terms of Dr. Fill's "loans" never clearly emerged. Until at least 1976, repayment was never discussed. Dr. Fill testified that the Mullikases were hopeful that Dr. Fill would leave public service, enter private practice and earn more money. The amount lent was similarly vague; Dr. Fill testified it was over $300,000 between 1966 and 1980, a number which he derived solely from a notebook kept by Mrs. Mullikas. Unfortunately,

---

**1.** He had earlier testified that his share of the purchase price of Apartment 14E came from his own money.

**2.** We granted the Trustee's motion for leave to depose Mrs. Mullikas after the deadline for the completion of discovery had passed, but the Trustee ultimately determined to forego the right. *See Gray v. Fill,* 68 B.R. 923 (Bankr.S.D. N.Y.1987).

**3.** The numerous excuses he offered do not here bear repeating. Suffice it to say that he even attempted to abrogate his earlier testimony with the explanation that he was embarrassed ever to say that he had no memory of something so he gave imprecise answers in an effort to please the questioner.

that notebook seems to have vanished sometime prior to this trial.

Mrs. Fill corroborated their receipt of cash subsidies from her parents; the deposit of some of the receipts into the Fills' joint checking account; and that the money was lent. She also testified that Dr. Fill told her several times he would repay her parents when he entered private practice. But Mrs. Fill admitted that she was not present at any discussions between Dr. Fill and her parents regarding this money. She believes the loans between 1966–1980 to have aggregated $375,000, a number she, too, derived from Mrs. Mullikas' missing notebook.

Hans Blunck ("Blunck"), a close and old friend of the Mullikas family, testified that money had been lent and not donated because there had been talk about a "debt relationship between Dr. Fill and the Mullikases," and because Blunck in 1976 had heard Dr. Fill acknowledge an obligation. However, Blunck admitted that he knew of no distinction between money given to Dr. or Mrs. Fill; he understood the money to have been given to support all the Fills and to allow Dr. Fill to get started in a medical practice.

Although Dr. Fill may have acknowledged his claimed debt to his in-laws in 1976, just after his father had died and left Dr. Fill an inheritance, he did not repay the Mullikases. The evidence reveals no repayment until 1983. In fact, Mrs. Mullikas claims that she and her husband lent *more* money to Dr. Fill subsequent to 1976. Although the Mullikases must have delivered some cash to the Fills, the highest amount which was substantiated was $32,660. (Exs. M1 and M2; Tr. 569–71, and 574–75). If, in fact, the Mullikases intended as they were delivering cash to Dr. Fill that Dr. Fill was obligated to repay them, which we seriously doubt, they also intended, as Dr. Fill testified, that the monies were to be repaid when Dr. Fill had established himself and was earning a substantially higher salary. Yet the actual repayment came under diametrically different circumstances.

## B. THE DIVORCE

By the end of 1976, the Fills' marriage was shaky. In 1977, Mrs. Fill left Dr. Fill to live with a musician in the Virgin Islands. She remained there through August 1981. Christian resided in New York with Dr. Fill but spent vacations with Mrs. Fill in the Virgin Islands or in Europe. During these years, Mrs. Fill travelled frequently to New York, generally on a monthly basis and for weeks at a time, often to care for Christian when Dr. Fill was away. But regardless of Dr. Fill's presence or absence, when Mrs. Fill was in New York she stayed with her family at Apartment 14E. Although Mrs. Fill paid her own expenses when she was in the Virgin Islands, Dr. Fill sometimes paid her travelling and New York expenses and also supported Christian. Even during her absence from New York, Mrs. Fill remained in charge of writing out household checks and balancing their checkbook. She also assisted Dr. Fill in his medical practice (he had begun practicing in 1975) during her frequent stays in New York.

In February 1978, Mrs. Fill transferred to Dr. Fill her fifty percent interest in Apartment 14E and her fifty percent interest in the Condominium. At trial she flatly denied that these transfers were made by her in contemplation of a property settlement or divorce. Her explanation was that her husband was very concerned that she was living with another man and that she might get pregnant; thus, to protect himself and his son, he asked her to transfer to him her interests in the properties. She claims to have initially refused but to have ultimately made the transfers for three reasons, because (i) Dr. Fill had threatened to curtail Christian's visits with her; (ii) Dr. Fill needed to show assets and also required record ownership of Apartment 14E to obtain a $28,000 loan which he would use to purchase a medical office, and (iii) Dr. Fill assured her that he was protecting her and promised that should he sell either of the properties, he would give her back her half or, if Christian became of age (he was then eleven), would transfer the Condominium to him. The force of her explanation for the transfers is considerably weakened

by several facts. At no time did Mrs. Fill endeavor to get Dr. Fill's "promise" in writing despite the fact that her relationship with him was very bad. She claims to have relied on Dr. Fill's oral assurances at the same time as he was threatening her. And, finally, although he did pledge the shares of Apartment 14E and obtain the loan, no medical office was acquired until some two and a half years later when the Fills took title as joint tenants with a right of survivorship.[4]

Dr. Fill related several different versions of how he came to acquire Mrs. Fill's interest in Apartment 14E. Shortly after he first filed for bankruptcy, he testified:

Question: Did you ever acquire the full interest in that apartment in your own name?

Answer: Yes.

.    .    .    .    .

Question: Did you pay her anything to acquire her interest in that apartment?

Answer: No, that we agreed upon.

Question: She, you mean, just simply transferred her interest to you for no consideration.

Answer: Yes.

Tr. at 357.

At trial, he declared that testimony inaccurate. Instead he volunteered that he pressured Mrs. Fill to make the transfers. He readily, consistently and eagerly testified that he induced his wife to make the transfers through a combination of manipulation, threats, deceit and inequitable conduct. He also confirmed his oral promise to her. Later, however, through a vigorous examination by the Trustee's counsel, Dr. Fill let slip the real motive behind the transfers: they were to be an appropriate disposition of the Fills' matrimonial dispute.

In January 1979, less than a year after Mrs. Fill transferred her interest in the properties, the Fills entered into a separation agreement. Soon after, Dr. Fill began an action for divorce. In March 1979, the marriage was dissolved. The divorce decree incorporated but did not merge the separation agreement which settled Dr. and Mrs. Fill's financial and marital rights. It provided that more or less all personal property in the possession or control of Dr. Fill was to be his and that personal property in Mrs. Fill's possession and control was to be hers. They waived their rights to each other's bank accounts and they released all claims to each other's real and personal property. No mention was made of the oral promise between the Fills. However, a provision was made to allow Mrs. Fill to stay in Apartment 14E when she was visiting her son or when Dr. Fill was travelling. The Fills agreed to a joint custody arrangement of Christian similar to the way they had already been sharing custody. In addition, when Christian was residing with Mrs. Fill, Dr. Fill was to pay $60.00 weekly and remained at all other times responsible for his other expenses which included education, clothing, insurance, medical bills and country club expenses. Mrs. Fill waived her right to support; the separation agreement stated specifically that she intended to be fully self-supporting. The Agreement also contained a provision that they entered into it freely and voluntarily, that they obtained independent legal advice and that they understood clearly all its provisions.

While the separation agreement did not specify each piece of personal and real property, it appears that at the time of the divorce Mrs. Fill owned a house in the Virgin Islands and a house in Germany. Further, she maintained bank accounts in her own name in New York and Germany. She also continually received money from her parents and had income from an apartment building in Germany.

Although Mrs. Fill claims to have consulted an attorney [5] in 1981 about the separation agreement and divorce decree, she

---

4. Mrs. Fill explained that although they were living apart and had a poor relationship, she acquired half the cooperative with Dr. Fill because she thought it to be a good investment for her money.

5. She consulted Eleanor Brown, Esq., who figures prominently in one of the transfers which the Trustee seeks to avoid.

never took any legal action to challenge the agreement. Yet she seeks to challenge it some eight years later in this proceeding, attacking both its provisions and its creation. Her challenge is predicated primarily on the following set of claimed facts.

Dr. Fill asked her to come to New York to sign papers. She did and, still unenlightened, accompanied her husband to the office of a lawyer named Murray Ramson. Dr. Fill then told her he was worried about what was going on in the Virgin Islands, and he presented her with a separation agreement which he told her was designed to protect the Fill family. Mrs. Fill testified that she did not herself read the agreement but that Ramson read it to her and that she requested a change or two. With the changes which she requested, she signed the agreement. She never objected to the fact that the agreement did not incorporate the understanding regarding Apartment 14E and the Condominium. Mrs. Fill testified that she had no independent counsel, thought Ramson was representing all of them and did not understand that she was waiving any rights to Apartment 14E and the Condominium.[6] She returned to Ramson's office about three days later to sign something.

Mrs. Fill testified that she did not know that a divorce action was being commenced. Dr. Fill agreed, describing his scheme to obtain a divorce and deprive Mrs. Fill of all her marital property. But his pre-trial testimony was wholly at odds with that account; he had testified that Mrs. Fill agreed to convey the property to him as part of a property settlement because she was leaving him. Moreover, the notion that Dr. Fill would by means of a divorce deprive Mrs. Fill of her property is inconsistent with the fact that she had eleven months earlier voluntarily transferred the properties to him. All that the separation agreement did was to confirm the earlier transfers. The original transfers were not unreasonable from her perspective given

en that she had property and income of her own, came from a wealthy family and had left Christian at home with Dr. Fill. What she obtained from the agreement was a child support obligation from Dr. Fill, clear title to all of her own property, which was not insubstantial, and the freedom to pursue her life in the Virgin Islands. In short, we believe that Dr. Fill's earlier testimony was accurate.

## C. MRS. FILL'S RETURN

The Fills' divorce was clearly a well kept secret. They did not tell Christian, the Mullikases,[7] their friends or the Internal Revenue Service. They continued to file joint income tax returns through 1984 and maintain a joint checking account.[8] And at the end of August 1981, Mrs. Fill returned to live with Dr. Fill and Christian.

When Mrs. Fill returned, Dr. Fill's financial picture was poor. He had been incurring significant losses from trading gold and was deeply indebted to Gray International. Dr. Fill was well aware of his mounting debt. On January 15, 1982, he met with Gray (principal of Gray International) and Gray's accountant at which time he offered to Gray some unimproved land in the Virgin Islands, but no more, and said that he was unable to pay the indebtedness. They arranged to meet again a week later. Dr. Fill did not attend the January 22 meeting but instead sent Mrs. Fill, who informed Gray that she and Dr. Fill were divorced but that she was attending in his stead because he was recuperating from a second heart attack (which he had suffered in October 1981). They were joined by Michael Remer ("Remer"), Gray International's attorney. Both Remer and Mrs. Fill testified about their discussion. One wonders if they attended the same meeting.

Remer, a particularly credible witness whose testimony was refreshed through a memorandum he wrote following the meet-

---

6. She did not call Ramson as a witness to testify about what he did and did not explain to her.

7. Mrs. Mullikas may have learned of it in 1982 or later.

8. There may have been a brief hiatus when Dr. Fill maintained the checking account in his own name.

ing,[9] recalled that Mrs. Fill told them she had understood the debt to be $600,000 (they informed her it was in fact $785,000) and that she had felt badly about $60,000 of that amount (which Gray International had paid to Dr. Fill as initial profits). She indicated that the Fills were prepared to give Gray International a Mercedes Dr. Fill had purchased with part of that $60,000 and pay some $30,000 which was currently in a certificate of deposit which she owned. Remer also recalled Mrs. Fill saying that they had consulted a litigation lawyer who advised that Dr. Fill was not liable for the balance over the $60,000 for reasons which Mrs. Fill explained. She told Gray he should have no reason to believe Dr. Fill could or would repay the money because he did not have sufficient assets. She indicated that while Dr. Fill had some land in St. Thomas, a poor market prevented him from selling it and, further, his income was an open question because of his illness. She also informed them that another asset of Dr. Fill's, part ownership with his family of a building in Europe, was tied up in litigation. She described as her own Apartment 14E as well as the Fifth Avenue cooperative where Dr. Fill practiced.[10]

Remer recalled that he and Gray informed Mrs. Fill that payment of the $785,000 was urgent and that they would be willing to work out a payment schedule; failing which they would pursue other remedies. They requested a statement of Dr. Fill's assets as well as of his intentions. Remer also asked what Dr. Fill wanted to do about two February contracts coming due; Mrs. Fill suggested they ought to be sold so as to cap Dr. Fill's obligation. Remer prepared a letter to that effect for Dr. Fill's signature. The meeting closed, but not without Remer repeatedly expressing the urgency of the situation and Gray International's readiness to take action.

We proceed to Mrs. Fill's account of the meeting. She testified that until the morning of the meeting, she knew nothing about Dr. Fill's indebtedness to Gray International (although she admits that she learned in 1980 that he was trading gold through Gray International). That morning Dr. Fill asked that she go in his place; she did. Gray explained that Dr. Fill owed a substantial sum of money but did not give a stated amount. They discussed how the debt was incurred and Mrs. Fill requested that they liquidate the outstanding contracts. Mrs. Fill had no recollection of ever offering $30,000, of stating she consulted a litigation lawyer, or of informing Gray and Remer that she owned Apartment 14E or the medical office. We find Remer's testimony the more credible.

Mrs. Fill would have us believe she knew nothing of Dr. Fill's desperate financial condition until this time. However, it is undisputed that it was no secret to her parents. Blunck testified that when he was in New York in April 1981 (some nine months before the January 1982 meetings) he had learned from Dr. Fill of his great financial difficulties. When Blunck returned to Germany the following month he informed the Mullikases about Dr. Fill's financial embarrassment and suggested they attempt to get back the money they gave Dr. Fill. In December 1981, Mrs. Fill visited with her parents in Germany at which time they discussed a possible lawsuit to be brought by Mrs. Mullikas against Dr. Fill.

## D.  GRAY INTERNATIONAL LAWSUIT

Soon after the January meetings with the Fills, on February 24, 1982, Gray International commenced a lawsuit against Dr. Fill in New York Supreme Court to recover the sum of $838,252 plus interest ("Gray Lawsuit"). The Fills approached Eleanor Brown ("Brown"), the attorney whom Mrs. Fill says she consulted about the divorce decree, to represent Dr. Fill. Eleanor Brown testified she referred the matter to the law firm of Wallman, Wechsler & Spector, P.C. ("Wallman Firm") from whom she sublet office space and with whom she

---

9.  Mr. Remer's testimony is in harmony with his memorandum of the meeting. The memorandum was introduced in evidence.

10.  Neither assertion was true. Title to Apartment 14E was in Dr. Fill and title to the medical office was joint.

sometimes shared clients. The Wallman Firm vigorously fought and dodged the Gray Lawsuit, causing Gray International to obtain court orders, on two occasions, compelling Dr. Fill to appear for examination and produce documents. In the second of these orders, the court found that the Wallman Firm had "unreasonably impeded [Gray International's] attempt to conduct an examination of [Fill]" and awarded sanctions against the Wallman Firm. After the completion of discovery, Gray International moved for summary judgment, which was granted in May 1984. Judgment in the amount of $1,037,644 was thereafter entered against Dr. Fill and post-judgment discovery ensued. When Dr. Fill filed his bankruptcy petition, Gray International was listed as his only creditor.[11]

We step back now to examine the role that Brown played in representing Dr. Fill. Although she described herself as having been merely the referring attorney, the evidence shows otherwise.[12] Dr. Fill's answer in the Gray Lawsuit stated that the Wallman Firm was "Trial Counsel to Eleanor A. Brown, Esq." She notarized Dr. Fill's signature on the answer, but claims not to have seen her name on the document. She admits, however, attending a deposition of Dr. Fill in July 1982.[13] And she admits having invoked the attorney client privilege on Dr. Fill's behalf when she was deposed concerning her role in the Gray Lawsuit. The Wallman Firm kept Brown advised about the Gray Lawsuit. Brown's testimony was entirely evasive on this point, as well as on many others, but she eventually did admit both to being kept informed and to discussing the lawsuit with the Wallman Firm from "time to time." Tr. 790–91. She was informed, at a minimum, of the deposition, entry of judgment and Gray International's efforts to collect on the judgment.

Brown also admitted that she may have discussed the Gray Lawsuit with Mrs. Fill. In fact it was Mrs. Fill who paid Brown $10,000 for Dr. Fill's representation, which sum Brown delivered to the Wallman Firm. Simply put, Brown's testimony left no doubt that she participated in representing Dr. Fill.

Unfortunately for Gray International, it could not satisfy its judgment. Gray International later discovered that while it was meeting with and afterwards pursuing Dr. Fill, he transferred out of his name the Condominium and, with the help of Mrs. Fill, Mrs. Mullikas, Brown, the Wallman Firm and a lawyer named Harris Rakov, the proceeds from the sale of Apartment 14E.

### E. THE CONDOMINIUM

On January 18, 1982, just three days after Dr. Fill met with Gray and just four days before Mrs. Fill met with Gray and Remer, Dr. Fill transferred to Mrs. Fill title to the Condominium. No consideration passed.[14] Significantly, Mrs. Fill never mentioned this property or its transfer to Remer and Gray.

Mrs. Fill described as wholly coincidental the close timing of this transfer to the meeting with Gray. Her explanation was that she had asked Dr. Fill in the spring of 1981 to effect the transfer; that he refused; and that in May of that year she engaged a lawyer in the Virgin Islands who mailed an unexecuted deed to Dr. Fill. Dr. Fill did not get around to signing it until January 1982, according to Mrs. Fill, because of his travels, his heart attack in October 1981 and her lawyer's vacation. Mrs. Fill also testified that she threatened to sue Dr. Fill and tell her father about the

11. He later amended his schedules to reflect several *de minimus* debts to professional associations, some $2,200 due on his health insurance policy and some $4,700 in priority taxes.

12. Her role in representing Dr. Fill is critical since, as the facts will later reveal, she was simultaneously orchestrating Mrs. Mullikas' suit against Dr. Fill.

13. Brown testified that she was merely keeping Dr. Fill company until his attorney, David Spector of the Wallman Firm, arrived. Yet she entered an appearance with the court reporter.

14. The deed by which Dr. Fill transferred the property denominated Mrs. Fill as his wife despite their divorce.

separation agreement if Dr. Fill did not make the transfer.

Although the Fills originally owned the Condominium jointly, Mrs. Fill believed herself entitled to the entire property; half was what he had promised her and the other half was to compensate her for having been cheated in the divorce and for not having gotten "anything out of all of those years of marriage...." Tr. 1003.

## F. APARTMENT 14E

During the pendency of the Gray Lawsuit, the second disputed transfer was made.

Dr. Fill contracted to sell Apartment 14E for $270,000. The purchasers gave him a deposit of $27,000 which Brown held in her escrow account. On March 16, 1983, represented by Brown, Dr. Fill closed on Apartment 14E, receiving a $243,000 cashier's check. On Brown's advice, Dr. Fill immediately endorsed the check over to his mother-in-law, using the following language

> Pay to the order of Kate Mullikas in full satisfaction of a judgment entered in February 1983 in the Office of the Clerk of New York County.
>
> /s/ J. Herbert Fill

The endorsed check was given to Mrs. Fill that same day. She deposited the money into a joint account she maintained with her mother. The $27,000 deposit was partially consumed by closing costs; Brown drew a check to the order of Mrs. Mullikas for the balance of approximately $7,360 and gave it to Mrs. Fill to deposit in her mother's account.

Brown was busy on March 16, 1983. In the morning she represented Dr. Fill at his closing, in the afternoon, Mrs. Fill at her closing on an apartment at 1056 Fifth Avenue (Apartment 6E), just steps away from Apartment 14E. However, the new apartment was in Mrs. Fill's name only. Dr. and Mrs. Fill moved into Apartment 6E, where they both still live, despite the fact that their personal relationship was supposedly then and supposedly remains miserable. They each pay half of the monthly maintenance.

Mrs. Fill's new apartment was purchased for $400,000. After her ten percent deposit, she owed a balance of $360,000 which she paid at closing as follows:

She maintained a joint money market account with her mother. On the morning of March 16, 1983, the balance in that account was some $233,000 which comprised money she received from her parents and money she received from selling a house she owned in St. Thomas. Mrs. Fill immediately deposited the $243,000 check that Dr. Fill endorsed to her mother into a joint passbook account which Mrs. Fill maintained with her mother and then transferred that sum into the joint money market account. Simultaneously, Mrs. Fill drew a check for $360,000, the balance due on Apartment 6E.[15]

In Mrs. Fill's view, she paid for Apartment 6E by using the $233,000 originally in the account and $127,023 in proceeds from Apartment 14E to which she had convinced her mother she was entitled. The balance in the joint money market account Mrs. Fill believed belonged to her mother. Although Mrs. Fill withdrew money from the account on several occasions, she repaid much of it to her mother. Ultimately, in January 1986, the account (containing some $101,000) was closed by Mrs. Mullikas personally on her daughter's advice that the money could be lost in the bankruptcy case.

The Fills urge that the sale of Apartment 14E and the purchase of Apartment 6E had no connection. Mrs. Fill claimed that she simply sought to get her own apartment and live apart from Dr. Fill. But that testimony is unpersuasive, both because

15. The Trustee makes much of the fact that the $243,000 was originally deposited into the joint passbook account and then transferred into the money market account, a fact the Trustee finds significant because he asserts that the money market account was not a joint one. Apparently three months of statements on that account showed only Mrs. Fill's name but thereafter reflected both Mrs. Fill's and Mrs. Mullikas' names. We believe that the statements reflected the bank's error and are convinced the account was a joint one since the signature card opening up the joint account bore the signatures of both Mrs. Fill and Mrs. Mullikas. Although the date on the card is illegible, Mrs. Mullikas' signature came first.

Dr. Fill testified that Mrs. Fill intended for Dr. Fill to reside with her (although he wasn't sure he wanted to do so), and because the documentary evidence belies it. Submitted to the cooperative board regarding the Apartment 6E acquisition was a purchase application stating that Dr. and Mrs. Fill and their son would be residing there; [16] Dr. Fill's curriculum vitae; four social reference letters from friends and neighbors attesting to both the Fills' characters; bank letters which referred to Dr. Fill's accounts and a financial statement reflecting the Fills' joint finances.[17] (We cannot fail to note that the claimed $300,000–375,000 indebtedness to the Mullikases was not revealed in the financial statement.) We do not believe there was any doubt that Dr. Fill was moving into Apartment 6E, particularly since the Con Edison account and telephone listing were put into Dr. Fill's name and he joined Mrs. Fill within only a couple of days of her move. Further, Mrs. Fill testified she felt a duty to take care of him because of his ill health; in fact, Dr. Fill had no where else to live.

## G. MULLIKAS LAWSUIT

Mrs. Mullikas defends the transfer to her of the $250,360 [18] as being in satisfaction of a judgment she obtained against Dr. Fill. Indeed, Mrs. Mullikas had expeditiously obtained the judgment during the time Dr. Fill was fighting the Gray Lawsuit. But the manner in which she obtained that judgment is highly questionable.

By letter dated January 18, 1982 (the same date the Condominium was transferred to Mrs. Fill), Mrs. Mullikas wrote a letter to Dr. Fill which read in part:

Dear Herb,

I am sorry to hear about Your Financial [sic] difficulties at this time. I am worried about the outstanding loans....

I must ask you at this time to repay the outstanding loans immediately.

Greetings,
Kate

That the letter referred to Dr. Fill's financial difficulties with Gray International is certain both from the text of the letter itself and from the testimony of Dr. Fill and Blunck.

By letter dated February 20, 1982 Mrs. Mullikas gave Mrs. Fill the authority to engage an attorney to obtain repayment from Dr. Fill. Mrs. Fill made no attempt whatsoever to mediate the dispute between her mother and Dr. Fill because she "didn't want to get involved." Tr. 636. But she did get involved. It was Mrs. Fill who requested Brown's assistance; however Brown, because of a perceived possible conflict of interest, "referred" the matter to another attorney, Harris Rakov. It is overwhelmingly clear that Rakov was actually Brown's hired gun, engaged to commence a suit against Dr. Fill on behalf of Mrs. Mullikas for the purpose of obtaining a speedy and uncontested judgment. Rakov never even spoke to Mrs. Mullikas, his purported client, but instead obtained all the facts and documents concerning Mrs. Mullikas' claim from Brown.[19]

On October 12, 1982, Rakov, on behalf of Mrs. Mullikas, instituted a suit against Dr. Fill by way of motion for summary judgment in lieu of complaint seeking $272,000 ("Mullikas Lawsuit"). The summary proceeding was based on four promissory notes which bore no interest and were dat-

---

16. The application refers to Dr. Fill as Mrs. Fill's husband.

17. Much dispute was engendered over this balance sheet because it referred to the Fills as husband and wife. Mrs. Fill insists she never provided the information to the tax preparer who compiled it for them. The preparer confirmed that Dr. Fill provided the information. Even if that be the case, it is clear at least that the Fills were working together to obtain Apartment 6E for both of them.

18. This is the sum of the $243,000 check and the $7,360 disbursed by Brown to Mrs. Millikas.

The Trustee would like us to find that Mrs. Mullikas received the entire $270,000 sales price of Apartment 14E. But we decline to do so; if Dr. Fill had not transferred the proceeds to Mrs. Mullikas, he would still have incurred closing costs. It is inappropriate to charge these against Mrs. Mullikas.

19. Conveniently, Brown could not recall at trial whether she provided Rakov with the necessary information but did testify that she spoke with Mrs. Mullikas on two occasions.

ed October 1966, January 1969, August 1973 and April 1980 in the respective amounts of $45,000, $150,000, $33,000 and $44,000. An affidavit of Kate Mullikas ("Mullikas Affidavit") attested to the relevant facts. Copies of the four promissory notes were annexed.

Before examining the veracity of the Mullikas Affidavit, we turn to its creation. Rakov drafted the affidavit and sent it to Brown. His cover letter stated he was enclosing the affidavit for signature by *"your client* Kate Mullikas, which is to be used for the motion in lieu of complaint in the [Mullikas v. Fill] action" and requested Brown to have the affidavit executed "[a]fter *your client* has verified that the information is correct ..." (emphasis added). Brown testified that she spoke with Rakov about the contents of the affidavit and made arrangements for the affidavit to be sent to Mrs. Mullikas via air courier. Mrs. Fill delivered the unexecuted affidavit to the courier. Brown also instructed Mrs. Mullikas to sign the affidavit before the American Consul. It was Brown as well who obtained possession of the original promissory notes upon which the Mullikas Lawsuit was based. One can only conclude that Brown and Mrs. Fill were instrumental in the commencement of the Mullikas Lawsuit.

So, too, was the Wallman Firm. Rakov's draft notice of motion for summary judgment consisted of a marked up copy of a notice which bore the name of the Wallman Firm (the firm *defending* Dr. Fill in the Gray Lawsuit). Rakov made changes in the wording of the notice of motion and struck out the Wallman Firm's name. Rakov's explanation for this seemingly damning exhibit is that he obtained a form pleading from a friend at the Wallman Firm. That explanation was ridiculous to the point of absurdity, for the typed "form" which he marked up already bore the caption "Kate Mullikas v. Dr. J. Herbert Fill" and already indicated that the plaintiff was seeking judgment against the defendant in the amount of $272,000. One of the former partners in the Wallman Firm testified with obvious discomfort that the form could not have come from his office be-

cause of the style in which it was typed and because the name of the firm had at some point changed. The implication from his unconvincing testimony was that someone other than a lawyer from the Wallman firm must have drafted a notice of motion and falsely attributed it to the Wallman Firm.

Any lingering doubt about the participation of the Wallman Firm in the commencement of the Mullikas Lawsuit was dispelled when, at the close of the trial, the Trustee's counsel discovered a memorandum prepared on July 20, 1982 by David Spector of that firm, before the Mullikas Lawsuit was instituted. The relevant portion of that memorandum was a reminder to Spector from himself. It stated:

Notwithstanding, the following items should be attended to without any further delay:

\*     \*     \*     \*     \*     \*

5. Action on note to be brought on by motion for summary judgment.

Plaintiff Ex. 72.

Spector admitted that the "note" referred to the "indicia of a debt which was due from Mr. Fill—Dr. Fill to his mother-in-law...." Tr. 1310. But he claimed, quite implausibly, that in spite of his own plain language that the matter "should be attended to without any further delay" he did not mean that an action on the notes had to be commenced immediately. Quoting Spector's own convoluted "explanation," he intended the language as

"a memorandum to me to remind me to discuss certain aspects of the possibility of the lawsuit which was—which might be brought by his mother-in-law against him in any discussion which I had with Dr. Fill later on."

Tr. 1286.

The Mullikas Lawsuit was of no surprise to Dr. Fill. Rather, he was expecting it, for he spoke with Rakov before the suit was actually commenced.

The Mullikas Lawsuit moved swiftly. Dr. Fill did not retain counsel, made no appearance and simply defaulted. One month after Rakov commenced the action,

his summary judgment motion was granted. On January 10, 1983, an order was entered and on February 14, 1983, a judgment in the amount of $272,100 was entered.

Two days after entry of the judgment, Rakov prepared a satisfaction of judgment, signing and notarizing it, but leaving the dates blank. Along with a certified copy of the judgment he forwarded the satisfaction to Brown.[20] Brown held the Satisfaction of Judgment in escrow. Rakov then billed Brown (not Mrs. Mullikas) for his services; Brown, who had been paid by Mrs. Fill, paid Rakov with checks drawn on her own account. One month later, Brown represented Dr. Fill at his closing on Apartment 14E, when she advised him to endorse his $243,000 check to the order of Kate Mullikas in satisfaction of the $272,100 judgment.

The timing and pace of the Mullikas Lawsuit are overwhelmingly suspect. The suit was commenced in October 1982, some eight months after the commencement of the Gray Lawsuit, yet in five short months, the default was granted, an order entered, a judgment entered and the judgment satisfied. Without Dr. Fill's wholehearted cooperation, the breakneck pace of the litigation and satisfaction of the judgment could never have been maintained. We note, moreover, that Dr. Fill reimbursed Mrs. Mullikas at a time when his financial condition was dreadful, which was hardly in keeping with the claimed understanding that his in-laws be repaid when Dr. Fill was established and earning a substantially higher salary.[21] Dr. Fill acknowledged that he did not oppose the Mullikas Lawsuit because he owed the money. He very much wanted to pay Mrs. Mullikas instead of Gray International:

... *I preferred to pay Mullikas,* because that would take care of one sure chunk of debt, which would clarify one issue completely, while, if I had gone with— into paying off Gray something, it would have never been enough; besides it was not clear yet how much it had to be.

Tr. 563 (Emphasis added). So while Dr. Fill helped Mrs. Mullikas race to judgment, he and the Wallman Firm bitterly opposed and intentionally dragged out the Gray Lawsuit. Accordingly, when Gray eventually obtained summary judgment, substantial assets of Dr. Fill had already been transferred.

Not only are the manner in which the Mullikas Lawsuit was commenced and prosecuted probative of the charges of fraud and collusion which the Trustee levels, but so are the notes and affidavit upon which the suit was based. They are false and deceiving and were undoubtedly drafted that way to assure entry of a quick judgment.

Paragraph 2 of the Mullikas Affidavit states clearly and unambiguously that the notes were made and delivered on the dates they bear.[22] Dr. Fill took no issue with this sworn statement. During discovery in this fraudulent transfer action he swore he signed the notes on the dates they bore (October 1966, January 1969, August 1973 and April 1980) and that there was no possibility that he signed them at later dates. An affidavit received in evidence contains a similar avowal.

The Mullikas Affidavit and Dr. Fill's sworn statements are blatant lies. The Trustee discovered that the forms upon which the notes were drawn were not published prior to the fall of 1974, leading to the irrebuttable inference that at least three of the notes were backdated. The parties eventually agreed to this fact. (*See*

---

**20.** Rakov testified that it was not his routine practice to prepare a satisfaction of judgment in advance of a judgment being satisfied but that he likely did so in this case because he had had been informed that the judgment had been or was to be satisfied.

**21.** His adjusted gross income for 1982 was $20,018 and for 1983 was $25,596. Plaintiff's Ex. 7(c) and 7(b).

**22.** Paragraph 2 states in pertinent part:

2. I have instituted this action to recover the principal sum of $272,000.00 with no interest on several promissory notes *made by the defendant* [Dr. Fill] *in October 1966, January 1969, August 1973 and April 1980* to the order of your deponent *and delivered to me by the defendant at those times.* (Emphasis added.)

Joint Pre-Trial Order: Undisputed Facts at ¶ 14).

At trial, Dr. Fill admitted that the notes were signed not on the dates they bear but at later dates. The first three notes he claimed were executed *after 1976* though the fourth note, dated April 1980, he claimed to have executed at approximately the date it bears. His pre-trial testimony was that all the Notes were executed in West Germany, his trial testimony, that the 1980 note was executed in New York.[23] Dr. Fill claims that no witnesses were present when he executed the first three notes (except his mother-in-law) but that the 1980 note was executed in front of Mrs. Fill.[24]

Faced with irrefutable evidence that his original story was untruthful, Dr. Fill concocted a new explanation for the notes. He testified that over the years the Mullikases would give small sums of money to him. Each time they did, Mrs. Mullikas would keep a record of it in a notebook. When these sums would accumulate, Dr. Fill would indicate his acknowledgement in the notebook. If he and Mrs. Mullikas were not in the Mullikas home when he received money, Mrs. Mullikas would make a note to herself and Dr. Fill would at the next opportunity acknowledge the loan. Sometime after 1976, promissory notes were issued for Dr. Fill's signature. The amounts stated on the notes represented cumulative totals of the small amounts given to him up to whatever date Mrs. Mullikas chose for the date of each note.[25]

Mrs. Mullikas now adopts this new explanation (see Post–Trial Memo of Kate Mullikas at 11) but in so doing necessarily admits to the falsity of paragraphs 3(a)–(d) of the Mullikas Affidavit since those paragraphs state unequivocally that the funds were borrowed in the amounts and on the dates the notes bear.[26]

Although Dr. Fill claims that he borrowed in excess of $300,000 and Mrs. Fill, that he borrowed in excess of $375,000, the four backdated notes add up to only $272,000. The proffered explanation is that Dr. Fill executed not four, but six, notes. Curiously though, Mrs. Mullikas never sued on all six notes and never made a demand for

23. This is curious because the 1980 Note bears the notation "Quickborn" which is where Mrs. Mullikas resides in Germany.

24. Mrs. Mullikas, of course, offered no explanation since she did not testify. But her lawyer suggested in her post-trial brief that she may not have understood that she was swearing to a false affidavit:

Mrs. Mullikas received the affidavit for execution in September 1982. By this time Mr. Mullikas was ill. Mrs. Mullikas' understanding of English is limited. She was never provided with a translation of the affidavit, but only with directions for its execution. Post–Trial Memorandum of Defendant Kate Mullikas at 36 (reference to transcript pages and exhibits omitted).

The last sentence is somewhat misleading. The testimony revealed only that Rakov and Brown did not provide her with a translation. We do not know if anyone in Germany assisted her although it is a matter of record that she had an attorney in Germany. *See Gray v. Fill (In re Fill),* 68 B.R. 923 (Bankr.S.D.N.Y.1987). And Mr. Mullikas (who had not yet died) and the Mullikases' son Jahn, a businessman, were fluent in English. Moreover, we note that Mrs. Mullikas' demand letter to Dr. Fill was written in English.

25. During discovery, Dr. Fill swore that the October 1966 payment of $45,000 was given to him in one lump sum.

26. Paragraphs 3(a)–(d) of the Mullikas Affidavit state:

3. (a) *In October 1966, defendant* [Dr. Fill] *borrowed forty-five thousand dollars ($45,000) from me,* and as evidence of that loan, he made and executed the above-mentioned promissory note in that amount. (See Exhibit A.)

(b) *In January 1969, defendant borrowed on hundred fifty thousand dollars ($150,000) from me,* and as evidence of that loan, he made and executed the above-mentioned promissory note in that amount. (See Exhibit A.)

(c) *In August 1973, defendant borrowed thirty-three thousand dollars ($33,000) from me,* and as evidence of that loan, he made an executed the above-mentioned promissory note in that amount. (See Exhibit A.)

(d) *In April 1980, defendant borrowed forty-five thousand dollars ($44,000) from me,* and as evidence the above-mentioned promissory note in that amount. (See Exhibit A.)
(Emphasis supplied.)
Mrs. Mullikas offers the same excuse used to explain the falsity of paragraph 2. *See* Post–Trial Memo. of Kate Mullikas at 35.

**215**

the remaining money.[27] From all of the evidence adduced, we conclude that the monies given to the Fills by the Mullikases in an aggregate amount which we consider unproven[28] were transmogrified into loans at the moment when it became apparent that Dr. Fill's assets might eventually be seized to pay someone other than the in-laws who had generously furnished funds to Dr. Fill and his family for some twenty years.

### III.

We dispose quickly of the Trustee's fourth claim for relief, namely, that the transfers were fraudulent pursuant to 11 U.S.C. § 548. There was no evidence that the transfers were made within one year before the bankruptcy petition was filed. Accordingly, that claim for relief is dismissed.

### IV.

Bankruptcy Code section 544(b) allows a trustee to avoid a transfer of a debtor's interest in property if the transfer is voidable under applicable law. The Trustee predicates his challenge to the transfer to Mrs. Mullikas of the proceeds from the sale of Apartment 14E on three sections of the New York Debtor and Creditor Law. We take the theories in turn.

#### A. *New York Debtor and Creditor Law § 273*

Section 273 of the New York Debtor and Creditor Law denominates as fraudulent those conveyances made by an insolvent for inadequate consideration.[29] The parties do not dispute that Dr. Fill was insolvent in March 1983 when he endorsed to Mrs. Mullikas the $243,000 check constituting the proceeds from the sale of Apartment 14E. The same holds true with respect to the time when Brown dissolved her escrow account and delivered to Mrs. Mullikas the $7,360 balance of the deposit from the purchasers of Apartment 14E.[30] After ridding himself of the proceeds from Apartment 14E, Dr. Fill's only assets at that time consisted of a fifty percent interest in his medical office which was valued (on his bankruptcy schedules) at $37,500 (Plaintiff's Ex. 30)[31] and some unimproved land in the Virgin Islands valued by Dr. Fill (in December 1982) at approximately $50,000 (Plaintiff's Ex. 6). Accordingly, Dr. Fill's total assets did not nearly approach his debt to Gray International which was, in January 1982, some $785,000.

The disputed issue is whether the transfer to Mrs. Mullikas was made without fair consideration. Such determinations turn on the facts of each particular case. *Orbach v. Pappa*, 482 F.Supp. 117, 119 (S.D.N.Y.1979).

Fair consideration is given for property, or obligation

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied,....

N.Y. Debtor & Creditor Law § 272(a). Pointing to her state court judgment for $272,100, Mrs. Mullikas insists that Dr. Fill transferred the money to her on account of

---

27. Nor did Dr. Fill list the remaining loans as a debt on the schedules accompanying his bankruptcy petition; his understanding was that they were forgiven.

28. Not only was Mrs. Mullikas' notebook not produced, but neither were bank records of the Mullikases, wire transfer confirmations or anything else which would tend to confirm the debt which was supposedly evidenced by the admittedly false notes.

29. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

N.Y. Debtor and Creditor Law § 273.

30. A person is insolvent
when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.
N.Y. Debtor and Creditor Law § 271(1).

31. Dr. Fill's bankruptcy schedules also reflect his ownership of some $52,000 in Keogh and I.R.A. accounts which he claims as exempt. The record does not reveal when these accounts were established.

an antecedent debt and in good faith. We disagree.

The test for fair consideration has two prongs, requiring an equivalent exchange of value *and* good faith. Thus even where there is a fair exchange of value to satisfy an antecedent debt, the conveyance may be set aside if good faith is lacking. *See, e.g., Julien J. Studley, Inc. v. Lefrak,* 66 A.D. 2d 208, 412 N.Y.S. 2d 901, 905 (2d Dep't), *aff'd,* 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979).

Generally, it is the creditor challenging the transfer, here the Trustee, who bears the burden of proof that the transfer was made without fair consideration. *ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. 1388, 1391 (S.D.N.Y.1987). "However, where the evidentiary facts as to the nature and value of the consideration are within the transferee's control, the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee." *Id.* And it is well settled that the burden on the transferee is a heavier one in the context of an intrafamily transaction. *Rhoades,* 653 F.Supp. at 1391; *Orbach v. Pappa, supra,* 482 F.Supp. at 119; *see also Liggio v. Liggio,* 53 A.D.2d 543, 385 N.Y.S.2d 33 (1st Dep't 1976).

■ We reject Mrs. Mullikas' argument that her state court judgment against Dr. Fill ends the inquiry of fair consideration. She argues that the judgment is *res judicata* and that any collateral attack the Trustee may mount based on fraud is limited to the law of the forum. Since New York law permits collateral attack based only on extrinsic fraud, Mrs. Mullikas asserts that the Trustee's collateral attack which is based on intrinsic fraud is barred.

■ We are mindful that the principle of *res judicata* applies in bankruptcy proceedings, *see Heiser v. Woodruff,* 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946), *reh'g denied,* 328 U.S. 879, 66 S.Ct. 1335, 90 L.Ed. 1647 (1946), even where the judgment was obtained by default. *See Kelleran v. Andrijevic,* 825 F.2d 692 (2d Cir. 1987); 1B J. Moore, Federal Practice ¶ 0.409[4] at 323 (2d ed. 1984). All federal courts are required to give preclusive ef-

fect to state court judgments whenever the courts of the state rendering the judgment would do so. 28 U.S.C. § 1738; *Allan v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). But this does not mean that we should adhere blindly to every state court judgment as an instinctive reaction to the intonement of the phrase *"res judicata."* As the Supreme Court cautioned:

> Because res judicata may govern grounds and defenses not previously litigated, however, it blockades unexplored paths that may lead to truth. For the sake of repose, res judicata shields the fraud and the cheat as well as the honest person. *It therefore is to be invoked only after careful inquiry.*

*Brown v. Felsen,* 442 U.S. 127, 132, 99 S.Ct. 2205, 2210, 60 L.Ed.2d 767 (1979) (emphasis added). We have made that careful inquiry and find several factors which militate against application of the doctrine.

First, there is no identity of the parties, a necessary requirement in a federal court for *res judicata.* *LM Ericsson Telecommunications, Inc. v. Teltronics Services, Inc. (In re Teltronics Services, Inc.),* 18 B.R. 705, 706 (E.D.N.Y.1982) *aff'd* 762 F.2d 185 (2d Cir.1985). The law in New York is no different; it follows the general *res judicata* rule, mandated by due process considerations, that a person is not barred from litigating a claim unless he was a formal party or in privity with a party to the first action. *Baldwin v. Brooks,* 83 A.D.2d 85, 443 N.Y.S.2d 906, 908 (4th Dep't 1981). To determine whether privity exists, the New York courts look to whether the interests of the non-party were effectively represented at the first proceeding. *Id.* The federal courts do the same.

> Generally speaking, one whose interests were adequately represented by another vested with the authority of representation is bound by the judgment, although not formally a party to the litigation. While often justified by the doctrine of privity, the theory underlying this general proposition is that the party bound is in substance the one whose interests were at stake in the prior litigation.

*Expert Electric, Inc. v. Levine*, 554 F.2d 1227, 1233 (2d Cir.1977), *cert. denied*, 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977) (citation omitted).

While it is true that a bankruptcy trustee is a successor to the debtor's property and for many purposes is deemed to be in privity with the debtor, that privity is not so complete as to bind the trustee to an adverse *in personam* judgment rendered against the debtor before the bankruptcy case was begun. For it is plain that the rights of creditors are not considered in the pre-bankruptcy suit. In *Coleman v. Alcock*, 272 F.2d 618 (5th Cir.1959), where a trustee was held not bound by a state court judgment declaring that certain transfers were not a fraud on a particular judgment creditor, the court explained:

> "[W]e are of the view that the Trustee is not bound, either on res judicata or judicial collateral estoppel, by the prior state court proceedings. The Trustee is, of course, a successor of the Bankrupt for many purposes. But he is much more both in the extraordinary rights with which the Bankruptcy Act invests him, and as a general respresentative [sic] of the creditors. Unless he intervenes and takes on the role of an active litigant subjecting himself thereby to the usual incidents of such action, he is not bound by the judgment merely because the Bankrupt was a party defendant in the prior litigation. Only in a limited situation will the Trustee be foreclosed. This will not include a mere *in personam* proceeding . . . . .

*Id.* at 621–22 (footnote omitted); *see Teletronics, supra*, 18 B.R. at 706 (reversing the bankruptcy court's determination that the trustee's claim was barred under principals of *res judicata* ); *Boyajian v. DeFusco (In re Giorgio)*, 62 B.R. 853, 862–63 (Bankr.D.R.I.1986); *Rodino v. Barondess (In re Good Time Charley's Inc.)*, 54 B.R. 157, 160 (Bankr.D.N.J.1984) and authorities cited therein; *Edleman v. McMullin Orchards (In re Silver Mill Frozen Foods, Inc.)*, 32 B.R. 783, 785 (Bankr.W.D.Mich.

1983); 1B J. Moore, Moore's Federal Practice ¶ 0.419[3–6] at 685 (2d ed. 1984). The bankruptcy court must "[strike] a fair balance between the principle of judicial finality and the interests of those who share in the bankrupt estate." 1B J. Moore, Moore's Federal Practice ¶ 0.419[3–6] at 675 (2d ed. 1984). Thus we conclude that a pre-bankruptcy *in personam* default judgment rendered against the debtor will not bind his bankruptcy trustee.

Such a holding is particularly compelling here where it is shown that the judgment was obtained with the cooperation of the debtor through fraud and collusion and with the aim of defeating the debtor's creditors. We cannot apply *res judicata* to so saddle the trustee and the creditors.

> [O]ne must remember that the Bankruptcy Act empowers the trustee, under certain circumstances, to avoid judicial liens and preferential, fraudulent, and other proscribed transfers, for the benefit of the unsecured creditors he represents . . . . Thus, the idea of the trustee's privity with the bankrupt will not be pushed to the point that the estate is bound by judgments that would defeat the proper and just objectives of the Bankruptcy Act.

*In re Silver Mill Frozen Foods, Inc., supra*, 32 B.R. at 786, quoting 1B J. Moore, Moore's Federal Practice ¶ 0.419[3–1] at 2968 (2d ed. 1980).

In the context of objections to claims, the law is clear that a trustee may, where there is fraud, collaterally attack a judgment.[32] In the seminal case, *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the trustee objected to a claim and the claimant argued that *res judicata* precluded the Bankruptcy Court from setting aside the judgment upon which the claim was based. The Supreme Court held that the judgment may be collaterally attacked by the trustee and that the bankruptcy court should set aside the judgment where it was obtained by collusion of the parties or founded on no real debt. *Id.* at

---

**32.** Just as a trustee has the independent fiduciary duty to examine claims and object to them, if appropriate, 11 U.S.C. § 704(5), he has a fiduciary duty to recover property of the estate, including property which was fraudulently transferred. 11 U.S.C. §§ 704(1); 544(b); 550.

306, 60 S.Ct. at 245. *See also Margolies v. Nazareth Fair Grounds & Farmer's Market*, 249 F.2d 221 (2d Cir.1957) (bankruptcy trustee may collaterally attack a judgment that was based on fraudulent notes and which fraud issue had not been raised in prior proceedings). *Cf. Heiser v. Woodruff, supra*, 327 U.S. 736, 66 S.Ct. 857–58 (reiterating the holding of *Pepper v. Litton* that a trustee is not bound by a judgment procured by fraud but applying *res judicata* because the fraud defenses had twice been litigated by the debtor *and* trustee).

We turn, therefore, to Mrs. Mullikas' judgment. We do not believe the Trustee to be bound by the judgment declaring the existence of a debt from Dr. Fill. The Trustee was not a party and his interests were not represented by Dr. Fill; to the contrary, Dr. Fill's interest was in clear opposition to the interest of the Trustee. Further, the judgment was collusive and laced with fraud.

Mrs. Mullikas' defense that she was not provided with a translation of her affidavit does not obviate its falsity and in no way affects the conclusion that the suit was collusive. Nor can she have failed to understand that she was submitting to a court notes which she knew she had backdated by many years. In any event the defense is not supported by the record. But taking the defense as true, for the moment, we would be compelled to discount the entire affidavit for she could not swear to that which she did not understand.

The balance of the record does no more to persuade us of the existence of fair consideration. It lacks any credible and persuasive evidence which would show that Dr. Fill transferred the Apartment 14E proceeds to satisfy any antecedent debt. Although the Trustee boldly asserts that the evidence does not even show that the Mullikases gave Dr. Fill money, we have inferred from the testimony of both the Fills and Blunck, as well as from the lifestyle the Fills were leading relative to Dr. Fill's income, that the Mullikases supplemented the Fills' income over the years. But there is no credible evidence to indicate how much money was given (let alone that it was the fair equivalent of the proceeds of Apartment 14E), precisely to whom it was given and, most significantly, that it was lent. For sixteen years (1966–1982) the Mullikases did not pursue or press Dr. Fill for repayment. Dr. Fill did not attempt to repay them, not when he inherited money from his father, not when he entered private practice and not when Gray gave him $60,000. Further, these "loans" were never represented on any financial statement of Dr. Fill. And Dr. Fill testified that the money was to be repaid only at such time as he had established himself and was earning a substantially higher salary.

Because knowledge of these intra-family transfers is within the control of Mrs. Mullikas, the burden of proving fair consideration has now shifted to her. *Rhoades, supra*, 653 F.Supp. at 1391. But she has come forward with little credible evidence. What she offers is a statement from Blunck that there had been talk of a debt relationship and that he once heard Dr. Fill acknowledge an obligation, Dr. Fill's explanation that as the head of the family he alone was obligated for their support, the discredited notes themselves, the judgment based upon them and the testimony of Dr. and Mrs. Fill that the amount of the indebtedness they knew from reading the elusive notebook. We conclude from this evidence and the record as a whole that Dr. Fill's transfer to Mrs. Mullikas of the Apartment 14E proceeds was not in satisfaction of an antecedent debt.[33] *Cf. Pearson v. Cuthbert*, 58 A.D. 395, 68 N.Y.S. 1031 (1st Dep't 1901) (transfer made in repayment of advance from mother to her son to allow him to go into business, when advance made with understanding that it was not to be repaid unless profits were earned from the business, in default of which it was to be deducted from son's inheritance from mother, was fraudulent as to son's creditors).

---

**33.** Even if the cash which changed hands were found to have been loaned, there is no credible evidence from which we could determine how much money was lent.

▇ Assuming that there existed an antecedent debt, we would still hold the transfer to be constructively fraudulent because of the lack of good faith. *See Julien J. Studley, Inc. v. Lefrak, supra,* 66 A.D.2d 208, 412 N.Y.S.2d 901; *Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dep't 1978); *Spear v. Spear,* 101 Misc.2d 341, 421 N.Y. S.2d 277 (Sup.Ct.1979); *Pereira v. Checkmate Communications Co., Inc. (In re Checkmate Stereo and Electronics, Ltd.),* 9 B.R. 585, 617 (Bankr.E.D.N.Y.1981), *aff'd,* 21 B.R. 402 (1982); *see also Cohen v. Sutherland,* 257 F.2d 737, 742 (2d Cir.1958) (construing language of former § 67(d)(2) of the Bankruptcy Act which was similar to that of § 272). Good faith is not merely the opposite of actual intent to defraud but rather, the term imports "a failure to deal honestly, fairly and openly." *Southern Industries, Inc., supra; In re Checkmate Stereo & Electronics, Ltd., supra,* 9 B.R. at 617. It may be lacking where a transferee has knowledge of a transferor's unfavorable financial condition at the time of the transfer. *Checkmate, supra,* 9 B.R. at 617; *cf. Cohen v. Sutherland,* 257 F.2d at 742. It has been suggested that good faith is lacking where there is an absence of one or more of the following:

1. an honest belief in the propriety of the activities in question;

2. no intent to take unconscionable advantage of others; and

3. no intent to or knowledge of the fact that the activities in question will hinder, delay or defraud others.

*Sparkman and McLean Co. v. Derber,* 4 Wash.App. 341, 481 P.2d 585 (1971); *Southern Industries, Inc., supra,* 66 A.D. 2d at 183, 411 N.Y.S.2d 945; *Spear, supra,* 421 N.Y.S.2d at 281.

Mrs. Mullikas' assertion that she and Dr. Fill acted in good faith when he transferred the Apartment 14E proceeds holds no sway with us. Despite his failure to repay even one dollar's worth of "debt," she declined for sixteen years to sue him. She sued only when she discovered that Dr. Fill was being pursued by Gray and risked losing his assets.[34] And she did so by submitting a false and deceiving affidavit and backdated notes in a suit designed to proceed summarily. This method served to expedite a judgment and allow Dr. Fill to rid himself of his assets before Gray International could reach them. That is not good faith. *See, e.g., Spear v. Spear,* 421 N.Y.S.2d at 282. Mrs. Mullikas' sham lawsuit does not equate with fair and honest dealing.

Moreover, Dr. Fill impeded Gray International's lawsuit by failing to present himself for scheduled depositions. In so doing, he created the time for Mrs. Mullikas to bring her suit and obtain a judgment. He certainly knew her affidavit was false but did nothing except default and quickly rid himself of Apartment 14E to satisfy her judgment. He admitted that he intended to prefer her. His testimony that he failed to retain counsel and instead defaulted simply because he knew he owed the money is, like most of his testimony, implausible. If that were the truth, he would have long ago paid his mother-in-law or made some arrangements for payment over time, obviating the need for a suit.

In sum, we find the evidence supports the conclusion that the transfer to Mrs. Mullikas of the proceeds from the sale of Apartment 14E was made without fair consideration and while Dr. Fill was insolvent. Accordingly it may be avoided by virtue of § 273.

### B. *New York Debtor and Creditor Law § 273-a*

The Trustee next argues that the transfer is avoidable pursuant to section 273–a of New York Debtor and Creditor Law,[35]

> Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment

---

**34.** It is of no moment to us that Mrs. Mullikas may not have known precisely the identity of the creditor pursuing Dr. Fill, for the evidence is ample that she knew of his desperate financial picture.

**35.** Section 273–a *Conveyances by defendants*

because made without fair consideration at a time when Dr. Fill was a defendant in an action for money damages.

Conveyances within the ambit of this section, like section 273, are fraudulent as a matter of law without regard to questions of actual intent. *Republic Insurance Co. v. Levy*, 69 Misc.2d 450, 329 N.Y.S.2d 918, 921 (Sup.Ct.1972); *Superior Leather Company, Inc. v. Lipman Split Company, Inc.*, 116 A.D.2d 796, 496 N.Y.S.2d 845 (3d Dep't 1986); *see also Gross v. Russo (In re Russo)*, 1 B.R. 369 (Bankr.E.D.N.Y.1979).

Having earlier established that Dr. Fill made the transfer without fair consideration, we may analyze the remainder of the evidence quickly. At the time he made the transfer, March 1983, Dr. Fill was a defendant in the Gray Lawsuit, which sought money damages. That suit was commenced more than one year earlier, in February 1982, and the resulting judgment, obtained in September, 1984, was not satisfied. Accordingly, the transfer is avoidable pursuant to § 273–a.

### C. *New York Debtor and Creditor Law § 276*

The Trustee's final argument is that the transfer was made with actual fraudulent intent and is avoidable pursuant to section 276 of the New York Debtor and Creditor Law.[36] The Trustee has the burden of establishing actual fraud by clear and convincing evidence. *ACLI Government Securities, Inc. v. Rhoades, supra*, 653 F.Supp. at 1394; *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17, 20 (2d Dep't 1986), *appeal dismissed*, 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322 (1987).

Rarely, if ever, is actual intent susceptible to direct proof. *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983). Rather, it is generally established by inference from the circumstances surrounding the alleged fraudulent transfer. *Rhoades, supra; In re Russo, supra*, 1 B.R. at 381; *De West Realty Corp. v. Internal Revenue Service*, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976). These circumstances are commonly called "badges of fraud." Included among such badges of fraud are "(1) a close relationship among the parties to the transaction; (2) secrecy and haste of the sale; (3) inadequacy of consideration; and (4) transferor's knowledge of the creditor's claim and his own inability to pay it." *Rhoades, supra* 653 F.Supp. at 1394; *see also In re Kaiser, supra*, 722 F.2d at 1582; *De West Realty Corp., supra*, 418 F.Supp. at 1279; *Atlanta Shipping Corp., Inc. v. Chemical Bank*, 631 F.Supp. 335, 347 (S.D. N.Y.1986), *aff'd*, 818 F.2d 240 (2d Cir.1987); *In re Russo, supra*, 1 B.R. at 382. Our case contains all of the classical indicia.

Dr. Fill and Mrs. Mullikas shared a close family relationship for many years. Even today, her daughter resides with and cares for Dr. Fill, and assists him in his medical practice. Under the peculiar circumstances of this case we cannot say that the divorce of Dr. and Mrs. Fill would warrant an analysis of these transfers in any context other than intra-family. Accordingly, we are mandated to exercise heightened scrutiny. *See Rhoades, supra*, 653 F.Supp. at 1395; *Murkoff, supra*, 508 N.Y.S.2d at 22.

Of great significance is Mrs. Mullikas' full knowledge of Dr. Fill's financial dilemma, which prompted her to sue Dr. Fill when she did. Further probative of intent is the lack of fair consideration.[37] But in addition to all these indicia of fraudulent intent are the manner and design in which Mrs. Mullikas pursued Dr. Fill. She sued him and did so based on a false affidavit and fictitious notes which paved the

---

for the plaintiff, the defendant fails to satisfy the judgment.

**36.** The statute provides:
§ 276. Conveyance made with intent to defraud
Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

**37.** That is not to say that fair consideration can save a transfer that otherwise was made with actual intent to hinder, delay or defraud, because it may not. *See De West Realty Corp. v. I.R.S., supra*, 418 F.Supp. at 1279.

way for a summary disposition accomplished at a rapid, if not record, pace. Rakov, the lawyer purporting to represent Mrs. Mullikas, never spoke with his client but instead received all the pertinent facts from Brown. Brown, who was assisting Rakov in procuring a quick judgment against Dr. Fill, was at the same time assisting the Wallman Firm in vigorously defending Dr. Fill against Gray International. Brown was paying Rakov and paying the Wallman Firm. Further, the Wallman Firm was awaiting Mrs. Mullikas' lawsuit; we are convinced by the Spector memorandum, Spector's explanation of that memorandum, and Rakov's explanation of how he came to obtain a form for the motion for summary judgment from the Wallman Firm that the Wallman Firm was instrumental in initiating, expediting, supervising or monitoring the Mullikas Lawsuit. Satisfaction of the judgment was just as quick, accomplished without necessity of execution through the expedient of the sale of the apartment for just about the same sum as was owing to Mrs. Mullikas.

After weighing all the evidence we are left with the firm and definite conviction that the Mullikas Lawsuit was concocted by Dr. Fill, Mrs. Fill and Mrs. Mullikas to wrest Dr. Fill's most valuable and liquid asset from the reach of Gray International. Accordingly, we find that the transfer to Mrs. Mullikas was made with actual fraudulent intent. *Cf. Riker v. Gwynne,* 129 A.D. 112, 113 N.Y.S. 404 (1st Dep't 1908), *later app.* 139 A.D. 423, 124 N.Y.S. 124 (1910), *mod. on other grounds,* 201 N.Y. 143, 94 N.E. 632 (1911), *later app.* 150 A.D. 928, 135 N.Y.S. 1138 (1912) (conveyance fraudulent when made by son to his mother while action for large sum of money to which he had no defense was pending against him; conveyance stripped him of his property; he was insolvent to knowledge of mother or her attorney, who was also representing him in the pending action; the alleged consideration was past advances which appeared to be gifts for son's support rather than loans, the amount of which was uncertain; there was no proof that the property conveyed was not worth more than the alleged considera-

tion; and there was proof tending to show that the conveyance was made and accepted to hinder and delay one creditor pressing his claim and in order to keep the property in the family for the ultimate benefit of the son's childern.)

■ We cannot accept Mrs. Mullikas' argument that her liability to the estate be capped at $115,977.72.. The $243,000 check as well as the $7,360 balance of the deposit were issued to her. That Mrs. Mullikas voluntarily disposed of half the proceeds does not negate her receipt of the monies. *See Merrill v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118 (Bankr. D.Utah 1986); *cf. Mack v. Newton,* 737 F.2d 1343, 1357–61 (5th Cir.), *reh'g. denied sub nom. Equico Lessor, Inc. v. Roberts,* 750 F.2d 69 (5th Cir.1984); *Klein v. Tabatchnick,* 610 F.2d 1043, 1048 n. 4 (2d Cir.1979); *Gough v. Titus (In re Christian and Porter Aluminum Co.),* 584 F.2d 326, 339 (9th Cir.1978).

## V.

The Trustee seeks from Mrs. Fill the return of the Condominium, alleging that it was transferred to her without fair consideration, while Dr. Fill was insolvent and with an intent to delay and defraud Gray International. He also seeks to render Mrs. Fill jointly and severally liable for the transfer of all the Apartment 14E proceeds. The Trustee appears to be invoking 11 U.S.C. § 550(a)(2), which allows a trustee to recover from any immediate or mediate transferee of the original transferee. For the reasons that follow, we grant part of the relief requested.

It is true that Mrs. Fill deposited the entire $243,000 check from the sale of Apartment 14E into the joint checking account she maintained with her mother. However, Mrs. Fill testified that only half of that amount was given to her and used to purchase Apartment 6E. She testified that the remaining money was her mother's and that most of the money which was withdrawn was paid back to her mother. Mrs. Fill offered documentary evidence to support that position. Her mother, too,

withdrew money and ultimately closed the account in January 1986 by withdrawing the balance of approximately $101,000. The Trustee makes the bold assertion that Mrs. Mullikas then gave the money back to Mrs. Fill in the form of cash. This theory is completely unsupported by the record. Accordingly, before examining Mrs. Fill's defenses, we hold that her maximum liability for the Apartment 14E proceeds should be capped at $127,023, the amount of her purported share.

Mrs. Fill's defense that she had equitable title to half of Apartment 14E and half of the Condominium notwithstanding her conveyance of her legal title to Dr. Fill in 1978 is rooted in the law of trusts. She asserts the existence of oral, resulting and constructive trusts. We take each in turn.

## A. EXPRESS TRUST

Dr. Fill allegedly promised that if he ever sold Apartment 14E or the Condominium, he would return Mrs. Fill's share or transfer the Condominium to Christian when he became of age; this promise allegedly induced Mrs. Fill to make the transfers. Mrs. Fill accordingly asserts that an express trust was created.

An oral trust of real property is unenforceable in New York because the statute of frauds requires it must be evidenced by a writing.[38] N.Y. General Obligations Law §§ 5–703(1) & (3); 61 N.Y.Jur. *Trusts* §§ 69, 72 (1968); *Huntington Towers, Ltd. v. Franklin National Bank*, 559 F.2d 863, 871 (2d Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978); *Gambold v. MacLean*, 255 N.Y. 202, 174 N.E. 453 (1931). The same is true under Virgin Islands Law. 28 V.I.C. § 241; *Downing v. Fortuna Bay Estates, Inc.*, 17 V.I. 20, 25 (Terr.Ct.V.I.1980); *Fountain Valley Corp. v. Wells*, 19 V.I. 607 (D.V.I. 1983). It is undisputed that the Fills' purported trust was never reduced to writing.

■ Although the doctrine of partial performance may operate to take a pur-

ported oral contract out of the statute of frauds, *see* N.Y. General Obligations Law § 5–703(4); 61 N.Y.Jur. *Trust* § 71 (1968); *Fountain Valley Corp., supra,* 19 V.I. 607, the doctrine should not be lightly applied. The Second Circuit Court of Appeals has held that the part performance in question

"must be performance 'unequivocally referable' to the agreement, performance which alone and without the aid of words or promise is unintelligible as or at least extraordinary unless as an accident of ownership assured, if not existing."

*Huntington Towers, Ltd., supra,* 559 F.2d at 872, quoting *Burns v. McCormick*, 233 N.Y. 230, 232, 135 N.E. 273 (1922). *See also Lebowitz v. Mingus*, 100 A.D.2d 816, 474 N.Y.S.2d 748, 750 (1st Dep't 1984); *Jonestown Place Corp. v. 153 West 33rd Street Corp.*, 53 N.Y.2d 847, 440 N.Y.S.2d 175, 422 N.E.2d 820 (1981); *Trilogy Variety Stores, Ltd. v. City Products Corporation*, 523 F.Supp. 691, 695 (S.D.N.Y.1981). *See generally Hendersen v. Resevic*, 262 F.Supp. 36, 38 (D.V.I.1967) (applying Virgin Islands Law) (the acts relied upon as part performance must have been done pursuant to the agreement and be referable thereto.)

We draw from the facts adduced the conclusion that the transfer was made for reasons other than simply the alleged oral promise. Mrs. Fill is not the naive, vulnerable, inexperienced and unworldly woman described by her counsel. She is bright, articulate and shrewd enough to manage not only the Fills' personal finances but those of Dr. Fill's medical practice as well. She had left her husband and son, was fearful of her parents finding out, and was worried that Dr. Fill would restrict Christian's visits. Dr. Fill had little property and had had relatively insubstantial earnings while she had other significant assets. We conclude that she transferred the assets to settle their marital dispute and to pave the way for her peaceful and expeditious return to the Virgin Islands.[39] Even

---

**38.** The Trustee is free to assert the statute of frauds defense. *See* 11 U.S.C. § 558.

**39.** The subsequent agreement of separation in which she gave him the right to occupy Apart-

if Dr. Fill made the promise ascribed to him, it was not that promise which gave rise to the transfer.

> What is done must itself supply the key to what is promised. It is not enough that what is promised may give significance to what is done.

*Burns v. McCormick, supra,* 233 N.Y. at 232, 135 N.E. 273; *see also Lebowitz, supra,* 474 N.Y.S.2d at 750; *Fountain Valley Corp., supra,* 19 V.I. 607 (plaintiff's partial performance was motivated by reasons other than the purported oral agreement and thus the performance was insufficient to take the case out of the statute of frauds).[40]

The doctrine of full performance, where the trustee (here Dr. Fill) voluntarily recognizes the trust and conveys the property in accordance with it, may also operate to take an oral contract out of the statute of frauds. *See* N.Y.Jur., *Trusts* § 71 (1968). That doctrine is of no pertinence here, for when Dr. Fill eventually transferred the properties, he was not doing so on account of this purported oral trust but because he was attempting to put the property out of the reach of Gray International.

The credible evidence belies the existence of an oral trust with respect to Apartment 14E. When Dr. Fill sold Apartment 14E, he not only did not but actually refused to turn over to Mrs. Fill her claimed fifty percent share. Instead, he endorsed the entire check to the order of Mrs. Mullikas. Mrs. Fill herself conceded that she had to convince her mother to turn over half the proceeds. Certainly at that juncture there was no reason for Dr. Fill not to honor any agreement with Mrs. Fill. Accordingly, we do not believe that there was any oral agreement with respect to Apartment 14E, much less that Dr. Fill fully performed it.

The purported oral trust with respect to the Condominium is equally questionable. The alleged agreement was that if Dr. Fill

sold it, he would give Mrs. Fill half the proceeds or he would transfer the property to Christian when he became of age. But Dr. Fill did not sell it and did not transfer it to Christian. By Mrs. Fill's own account of their agreement, she was not entitled to the transfer of title at the time when she received it. Additionally, Dr. Fill consistently failed to turn over the Condominium but suddenly did so just three days after Gray International met with him to pursue recovery of its debt. And when the conveyance was effected, it was of the *entire* property, not just Mrs. Fill's purported fifty percent interest. Accordingly, we cannot view this transfer to be the result of a sudden voluntary recognition by Dr. Fill of an oral trust.

## B.  RESULTING TRUST

Mrs. Fill next argues that her transfer to Dr. Fill of her fifty percent interest in the Condominium triggered a resulting trust.[41] Virgin Islands common law governs, *see James v. Powell,* 19 N.Y. 2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967); *rearg. denied* 19 N.Y.2d 862, 280 N.Y.S.2d 1025, 227 N.E.2d 408 (1967), since there is no existing statutory or local law to the contrary. 1. V.I.C. § 4. *See Wallace v. Kilbride,* 319 F.2d 760, 763 n. 1 (3d Cir.1963); *Downing v. Fortuna Bay Estates, supra,* 17 V.I. at 25 n. 4.

> A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of.

Restatement of the Law (Second), Trusts, § 404 (1959). *See Weston v. Stuckert,* 329 F.2d 681, 682 (1st Cir.1964) (applying Vir-

---

ment 14E and waived her right to his property and he to hers confirms this.

**40.**  We are not impressed with the argument that the purpose for the transfers was to enable Dr. Fill to obtain a loan to purchase a medical office. It is doubtful that he needed two signifi-

cant pieces of unencumbered property to list as assets in order to obtain a $28,000 loan.

**41.**  She advanced no such argument with respect to Apartment 14E, recognizing that New York, whose law controls, has abolished resulting trusts.

gin Islands Law).[42]

The circumstances under which Mrs. Fill transferred her interest in the Condominium do not give rise to the inference that Dr. Fill was not intended to have the beneficial interest of that property. While it may be true that Mrs. Fill was not happy or eager to transfer the Condominium, we are convinced as we discussed above that her motivation in doing so was to obtain a quick and quiet resolution of her marital dispute with Dr. Fill. That Mrs. Fill decided to return some years later and undo her transfer does not bear on her intent at the time she made it. Had Mrs. Fill paid the purchase price and immediately allowed title to be taken by Dr. Fill, perhaps her argument might have had more force. But since they each took title, no presumption of a resulting trust properly arises. *Cf. Wallace v. Kilbride, supra,* 319 F.2d at 763.

## C. CONSTRUCTIVE TRUSTS

Mrs. Fill also asks us to impose a constructive trust on her fifty percent share of each of the properties. "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (Cardozo, J.) and quoted in *Brand v. Brand,* 811 F.2d 74, 77 (2d Cir. 1987). *See also Weston v. Stuckert, supra,* 329 F.2d at 682 (Virgin Islands law recognizes constructive trusts). To impose a constructive trust, four elements must be established:

(1) a confidential or fiduciary relationship;

(2) a promise, express or implied;

(3) a transfer made in reliance on that promise; and

(4) unjust enrichment.

*Bankers Security Life Insurance Society v. Shakerdge,* 49 N.Y.2d 939, 428 N.Y.S.2d 623, 624, 406 N.E.2d 440, 440 (1980); *Brand v. Brand, supra,* 811 F.2d at 77.

A marital relationship has been held sufficient to satisfy the confidential relationship factor of a constructive trust, *see, e.g., Janke v. Janke,* 47 A.D.2d 445, 366 N.Y.S. 2d 910 (4th Dep't 1975), *aff'd,* 39 N.Y.2d 786, 385 N.Y.S.2d 286, 350 N.E.2d 617 (1976); *Zuch v. Zuch,* 117 A.D.2d 397, 503 N.Y.S.2d 343, 348 (1st Dep't), *appeal denied* 68 N.Y.2d 611, 508 N.Y.S.2d 1028, 501 N.E.2d 601 (1986), because confidence and trust are ordinarily implicit in a marriage. *Janke,* 366 N.Y.S.2d at 914. In rejecting the notion of a confidential relationship between social friends, one court stated that "[t]heir relationship was not of a confidential or fiduciary nature, so 'pregnant with opportunity for abuse and unfairness' as to require equity to intervene and scrutinize the transaction." *Bontecou v. Goldman,* 103 A.D.2d 732, 477 N.Y.S.2d 192, 195 (2d Dep't 1984) quoting *Sharp v. Kosmalski,* 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976). Yet it is true that a confidential relationship may exist without marriage. *See, e.g., Sharp v. Kosmalski, supra.* This is so because it is the nature of the particular relationship and not its label which imports the necessary confidentiality. Certainly, Dr. and Mrs. Fill were technically married at the time Mrs. Fill transferred the properties, but we will not elevate form over substance to declare they shared in February 1978 a confidential relationship which, if all other factors were present, would give rise to a constructive trust.

---

**42.** Mrs. Fill points us to § 440 of the Restatement of Trusts 2d as support for her argument that a resulting trust arose when she transferred her share of the Condominium in 1978, some two years after the Fills jointly purchased it. That section, and the cases decided under it, deal with a "Purchase Money resulting trust." Such a resulting trust arises at the time the property is purchased where one person pays the purchase price but the property is conveyed to another person. *See* V A. Scott, *Law of Trusts,* §§ 405, 440 (3d ed. 1967). We do not find that section applicable because Dr. Fill utilized his own money (albeit some of it which he may have obtained from the Mullikases) to purchase his half of the assets and because the transfer occurred some two years after the purchase of the Condominium.

At the time Mrs. Fill transferred the properties to Dr. Fill, they were not living together. She had already left him to live with another man in the Virgin Islands. She testified that Dr. Fill had threatened to curtail their son's visits to her. They never socialized together and on her trips to New York, they did not live together as man and wife. There was animus and strain in their relationship. Accordingly, we find as a factual matter that the nature of their relationship in 1978 was anything other than a confidential relationship which could lay the predicate for a constructive trust.

That notwithstanding, as we discussed above, we do not find any express oral promise. Neither do we find any implied promise to hold the properties for Mrs. Fill. A promise will be implied where it is inconceivable that the transfer would have occurred in its absence. *See Sharp v. Kosmalski, supra* 40 N.Y.2d at 122, 386 N.Y.S. 2d 72, 351 N.E.2d 721; *Tordai v. Tordai,* 109 A.D.2d 996, 486 N.Y.S.2d 802, 804 (3d Dep't 1985); *Reiner v. Reiner,* 100 A.D.2d 872, 474 N.Y.S.2d 538, 541 (2d Dep't 1984) (all New York law). But we earlier discussed the likely explanation for the transfer, that Mrs. Fill was attempting to effectuate a property settlement in recognition of what she perceived as her obligations to Dr. Fill and that she was attempting to pave the way for a peaceful existence with the man with whom she was living in the Virgin Islands. Moreover, Dr. Fill's corroboration of Mrs. Fill's story is unpersuasive. That Dr. Fill now claims that there was an oral promise is expected for it was clear that the Fills were closely aligned at trial.[43] They live together and Mrs. Fill takes care of Dr. Fill and manages his medical practice. Given his precarious state of health, he might legitimately worry about how he would live were he now to alienate Mrs. Fill and possibly cause her to desert him again. Dr. Fill's pretrial testimony made no mention of oral promises and he ultimately admitted at trial that the

transfers were made to him as part of a fair resolution of their marital dispute.

If there were no promises, there can be no reliance. Further, the evidence belies any finding of reliance; we do not believe that a wife as sharp as Mrs. Fill who has left her husband and child to live with another man would rely on any oral promise by her husband when he is threatening to terminate or restrict her visits with their child. Dr. Fill was not unjustly enriched by the property settlement. There was reason enough for Mrs. Fill to make the transfers. Moreover, this is not a contest between warring spouses, but between a bankruptcy trustee and two former spouses who have apparently reconciled their differences. We cannot lose sight of the fact that Dr. Fill continues to enjoy use of both the Condominium and Apartment 6E. Finally if we assume that he made the promise alleged, he did not breach it, for he neither sold the Condominium nor did Christian come of age to receive it.

But equally important, where a wife gives record title to properties to her husband and allows him to treat with them as his own and testifies that she has made the transfers to permit the husband to obtain a loan, equity should not intervene to declare the properties in fact the assets of the wife, to the detriment of his creditors. *See In re Lockwood's Estate,* 154 Misc. 233, 276 N.Y.S. 768 (1935) (where the wife permitted the husband to operate her property, as a farm, in his own name, and to incur debt, without having her antenuptial agreement recorded, his creditors were entitled to reach the property.) Accordingly, we cannot impose a constructive trust in favor of Mrs. Fill.

## D. AVOIDANCE OF THE TRANSFERS

Since we are not persuaded by any of Mrs. Fill's trust agreements, we must now consider whether the Trustee may avoid the transfer of the Condominium and whether he may have any recovery from

---

**43.** Mrs. Fill even helped him prepare a list of places and dates regarding his travels in the 1960's and 1970's.

her of half the proceeds of the sale of Apartment 14E.

We start with the Condominium. Section 204 of Title 28 of the Virgin Island Code is identical to Section 273 of the New York Debtor and Creditor Law,[44] which was set forth earlier in this opinion. Mrs. Fill claims that the conveyance to her of the Condominium was in satisfaction of the debtor's antecedent support obligations to her. But the evidence quite clearly shows that the purported support obligations did not prompt the transfer; the transfer was made to deprive Gray International of the property. And we believe that Mrs. Fill shared this intention. Although she claims to have been ignorant of Dr. Fill's intent, her argument rings hollow. Blunck and her family knew of Dr. Fill's grave financial condition; she had discussed with her family in December 1981 (just a couple of weeks before the transfer) a possible suit to be brought by Mrs. Mullikas against Dr. Fill; Mrs. Fill maintained the family financial records and Dr. Fill's books of account; Dr. Fill sent her as his emissary to the meeting with Gray; and Remer recalled her having said only a few days after the transfer that she and Dr. Fill had consulted a lawyer about Dr. Fill's obligations and recalled her explaining the defenses which the lawyer said would be available. Further, she affirmatively misled Remer and Gray days after the transfer as to the ownership of Apartment 14E and the medical cooperative, reinforcing our conclusion that she shared Dr. Fill's intention. Moreover, no tribunal had ever been asked to relieve Mrs. Fill of what she now contends was an onerous separation agreement. Nor was any tribunal, including this one, ever asked to declare the amount of support to which Mrs. Fill might have been entitled were she to be relieved of the separation agreement. *Cf. Merman v. Miller*, 82 A.D.2d 826, 439 N.Y.S.2d 428 (2d Dep't 1981). In addition, Dr. Fill transferred to her the entire Condominium, not just

the fifty percent interest which she had conveyed to him. Thus, we cannot say that the transfer was made for fair consideration. Since Dr. Fill was unquestionably insolvent at the time of the transfer, it is avoidable.

The transfer is also avoidable pursuant to 28 V.I.C. § 207 (analogous to New York Debtor and Creditor Law § 276) because the Trustee established that the transfer was made with actual intent to hinder, delay and defraud Gray International. Like New York law, Virgin Islands law does not require that fraud be established by direct evidence but instead looks to the indicia or "badges" of fraud. *See Williams v. Vialet*, 19 V.I. 70, 72 (D.V.I.1982). The threat of litigation, the lack of fair consideration and an intra-family transfer are all badges of fraud. *Id.* "An intra-family transfer made for less than valuable or fair consideration provides a further inference of fraud." *Id.* The transfer of the Condominium to Mrs. Fill only three days after Gray International began its pursuit of Dr. Fill bears the very badges of fraud recognized by applicable law.

Where badges of fraud are shown, it is a well-settled rule that the burden shifts to the parties seeking to uphold the transfer to rebut the inferences thereby created and sustain the *bona fides* of the transaction. *Id.*, quoting *Pergrem v. Smith*, 255 S.W.2d 42 at 44 (Ky.Ct.App.1953). Mrs. Fill has not met that burden.

Under Section 550(a)(1) of the Code, the Trustee may recover the Condominium from Mrs. Fill, as the initial transferee. Mrs. Fill's reliance upon *F.D.I.C. v. Malin*, 802 F.2d 12 (2d Cir.1986) is, we think, misplaced. In *Malin*, the contested transfer was unquestionably made to satisfy the support obligation to a wife who had no knowledge of her husband's indebtedness to the plaintiff or of his insolvency. The evidence here is quite different. Mrs. Fill was not a purchaser for fair consideration

---

**44.** Although the Trustee pleaded only New York law, it is the situs of realty which under New York's conflict of law rules determines the law to be applied; and under New York law, a condominium is realty. *James v. Powell, supra,* 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967), New York Real Property Law § 339–g. The Trustee's allegations and proof are, however, sufficient to make a case under the Virgin Islands statute.

without knowledge of the fraud. *See* 28 V.I.C. § 209(1); New York Debtor and Creditor Law § 278(1).

■ We turn now to the proceeds of Apartment 14E. The Trustee is not entitled to recover the property transferred to an immediate transferee (Mrs. Fill) of the initial transferee (Mrs. Mullikas) who takes for value, in good faith, and without knowledge of the voidability of the transfer avoided. 11 U.S.C. § 550(a)(2) and (b)(1). Mrs. Fill does not appear to be claiming that she gave value for the transfer of the Apartment 14E proceeds to her. What she argues, which we have previously rejected, is that half of Apartment 14E was held by Dr. Fill in trust for her. Nor can we say that Mrs. Fill took the proceeds in good faith and without knowledge of the voidability of the transfer. She was fully informed of Gray International's claim and suit against Dr. Fill, and she had aided Mrs. Mullikas in obtaining a lawyer to represent her, in paying her counsel fees and in transmitting the Mullikas Affidavit to her for her signature. *See Cohen v. Sutherland*, 257 F.2d 737, 742 (2d Cir.1958); 4 L. King, *Collier on Bankruptcy*, ¶ 550.03[1] n. 3 (15th ed. 1987). Accordingly, the Trustee is entitled to recover the property from Mrs. Fill.

## VI.

### A. PUNITIVE DAMAGES

■ The Trustee seeks punitive damages from the defendants. Because these transfers were alleged to be fraudulent under state, rather than federal, law, we must look to the law of New York.[45]

In New York, the principle is well established that punitive damages are not properly imposed where the fraud alleged involves the removal of property from a creditor's reach. *James v. Powell, supra,* 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741; *Atlanta Shipping Corp., Inc. v. Chemical Bank, supra,* 631 F.Supp. 335. This is so because "effective remedies are provided against fraudulent conveyances, including the assessment against the tortfeasors, in appropriate cases, of the costs incurred in pursuing such remedies, and there is no need to offer the prospect of punitive damages as an inducement to suit." *James,* 19 N.Y.2d at 259, 279 N.Y.S. 2d 10, 225 N.E.2d 741, *citing Walker v. Sheldon,* 10 N.Y.2d 401, 404, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961). Further, the purpose of the fraudulent conveyance law is "to enable a creditor to obtain his due despite efforts on the part of a debtor to elude payment" and to "re-establish[ ] the status quo ante, rather than punishing the debtor." *Marine Midland Bank v. Murkoff, supra,* 120 A.D.2d 122, 508 N.Y.S.2d 17, 24, *quoting Hearn 45 St. Corp. v. Jano,* 283 N.Y. 139, 142, 27 N.E.2d 814 (1940); *see also* New York Debtor and Creditor Law §§ 278, 279. *Cf. Mack v. Newton, supra* 737 F.2d at 1362 (punitive damages not recoverable in a fraudulent transfer action brought pursuant to section 67 and 70 of the former Bankruptcy Act,

---

**45.** An award of punitive damages depends upon the object or purpose of the wrongdoing, not upon the existence of a wrongdoing, and thus it is proper to look to the "law of the jurisdiction with the strongest interest in the resolution of the particular issue presented." *James v. Powell, supra* 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *see also Jackson v. Koninklijke Luchtvaart Maatschappij N.V.,* 459 F.Supp. 953 (S.D. N.Y.1978); Restatement Second Conflict of Laws, Tent. Draft No. 9 (1964), § 3906, Comment C. 743. The purpose of punitive damages is to deter future wrongful conduct by the defendant and others, and to punish the defendant. Here, it is clear that New York has the "strongest interest" in the protection of its creditors and punishment of the defendants. The transferor, one of the transferees, the Trustee and the major defrauded creditor are all domiciliaries of New York and both the transfers took place in New York. Thus, it is proper that New York law govern the issue of punitive damages. But, in any event, we have found nothing to suggest that the law in the Virgin Islands would require us to reach a different result regarding the request for punitive damages.

In the Virgin Islands, since there is no local law to the contrary, the Restatement of Law would govern. V.I. Code Ann. Title 1, § 4 (1967). The standard for the imposition of punitive damages is set forth in the Restatement of Torts 2nd section 908(2). That section and the comments to it speak to outrageous acts (usually found in crime) committed either with an evil motive or reckless indifference. That is not the type of behavior present here.

the analogs to section 548 and 544, respectively, of the Bankruptcy Code.)

Where, however, (i) "the fraud, aimed at the public generally, is gross and involves high moral culpability," *Walker v. Sheldon*, 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961) or (ii) the "defendant's conduct evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply criminal indifference to civil obligations," *J.G.S., Inc. v. Lifetime Cutlery Corp.*, 87 A.D.2d 810, 448 N.Y.S.2d 780 (2d Dep't 1982), punitive damages may be appropriate. *See Thaler v. North River Ins. Co.*, 63 A.D.2d 921, 406 N.Y.S.2d 66, 67 (1st Dep't 1978) ("violation of public right or malicious violation of a private right must be shown in order for punitive damages to be awarded."); *Catalogue Service of Westchester, Inc. v. Insurance Co. of North America*, 74 A.D.2d 837, 425 N.Y.S.2d 635 (2d Dep't 1980) *appeal after remand* 90 A.D.2d 838, 456 N.Y.S.2d 79 (1982) (punitive damages not available against otherwise legitimate business for isolated transaction, must show gross and wanton fraud on the public.)

*In Walker, supra,* the defendant was charged with inducing the plaintiff, by means of false and fraudulent representations, to enter into a contract. The plaintiff alleged that it was but the latest victim of the defendant's continuing machinations which were the very basis of its business. The court imposed punitive damages, reasoning that "those who deliberately and cooly engage in a far-flung fraudulent scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff." *Walker* 10 N.Y.2d at 406, 223 N.Y.S.2d 488, 179 N.E.2d 497.

*See also Keen v. Keen*, 124 A.D.2d 938, 508 N.Y.S.2d 682 (3d Dept.1986), *appeal denied*, 69 N.Y.2d 609, 516 N.Y.S.2d 1024, 509 N.E.2d 359 (1987) (punitive damages properly awarded where defendants, over a period of six or seven years, "intentionally and willfully pursued a course of conduct bordering on criminality, consisting of a series of fraudulent transfers and vexacious lawsuits in both State and Federal courts").

We are guided by the decision in *Pereira v. Checkmate Communications Inc. (In re Checkmate Stereo and Electronics Ltd.)*, *supra*, 9 B.R. 585. In *Pereira*, the trustee unraveled as an actual fraud under the New York statute a "most sophisticated scheme" for the transfer of all the debtor's assets by the defendant's president to his father. Relying on *James v. Powell, supra*, 19 N.Y.2d at 260, 279 N.Y.S.2d 10, 225 N.E.2d 741,[46] the court declined to impose punitive damages. Further, the court questioned the trustee's right to seek punitive damages on behalf of the creditors.

The facts of our case involve a much less sophisticated arrangement than that in *Periera*. The transfer of the Condominium was simple and straightforward, albeit fraudulent. The transfer of the proceeds of Apartment 14E was certainly more convoluted and the subject of what can properly be viewed as a scheme. But we cannot say that either transfer rose to the level of culpability required in New York for the imposition of punitive damages.

## B. CONSTRUCTIVE TRUST

The Trustee asks for the imposition a constructive trust on apartment 6E in the amount of 67.5 percent of its present fair market.[47]

---

**46.** While *Periera* makes reference to a New York case which seems to create an exception to the rule against punitive damages where the conveyance is part of a larger scheme or conspiracy to defraud, *Chase Manhattan Bank v. Perla*, 65 A.D.2d 207, 411 N.Y.S.2d 66 (4th Dep't 1978), we find the facts of that case actually involve the degree of gross and wanton conduct which *Walker* deemed the predicate for an award of punitive damages. In *Perla*, the plaintiff alleged a conspiracy and defendant's abuse of his professional status by repeated fraudulent representations which inured to the defendant's own gain and the plaintiff's detriment. The court held that it would be proper for a jury to consider whether the defendant's conduct involved the degree of culpability necessary to impose punitive damages. Our facts do not rise to that level.

**47.** The Trustee's reasoning is that since $270,000 (the sales price of Apartment 14E) represents 67.5 percent of the $400,000 purchase price of Apartment 6E, he is entitled to a money judg-

Section 550 of the Code, by its terms, only enables the Trustee to recover the actual property transferred, or the value thereof. Here, if the Trustee is unable to follow the proceeds into Apartment 6E, he might be left without a source from which to enforce his judgment. Because we sit as a court in equity, we may fashion relief which is appropriate to remedy a wrong that may otherwise obtain an inequitable result; specifically, we may impose a constructive trust where an asset was purchased with the proceeds of a fraudulent conveyance. *Solomon v. Kaiser (In re Kaiser) supra,* 722 F.2d at 1584; *Hadley v. Acquafredda (In re Acquafredda)* 26 B.R. 909, 913 (Bankr.M.D.Fla.1983); *McGraw v. Randall (In re Bell & Beckwith)* 70 B.R. 725, 728 (Bankr.N.D.Ohio 1987). Since Mrs. Fill was not in good faith and without knowledge of the fraud when she received $127,023 of the proceeds from the sale of Apartment 14E, and since the Trustee has, as Mrs. Fill acknowledges, traced those monies into Apartment 6E, we will impress upon Apartment 6E (i) a constructive trust in favor of the Trustee for the benefit of all the creditors in the amount of 31.8 percent (the *pro rata* share of the purchase price of Apartment 6E represented by the $127,023 in proceeds from Apartment 14E) of the present fair market value of Apartment 6E, or (ii) an equitable lien in the amount of $127,023, plus interest, whichever is greater. *See* V A. Scott, *Scott on Trusts,* § 516 (3d ed. 1967) and the cases which it cites.[48]

SETTLE ORDER in accordance with the foregoing decision. The parties are directed to call chambers to schedule a hearing on the issue of attorney's fees.

ment against Mrs. Fill for that percentage of the present fair market value of Apartment 6E.

48. We note, however, that while we have found that the Trustee may recover from Mrs. Mullikas the entire amount that was transferred to her from Dr. Fill, and may have a constructive trust imposed upon Apartment 6E to the extent it was purchased with the proceeds of the sale of Apartment 14E, the Trustee is entitled to only a single satisfaction by reason of section 550(c).